**UNITED STATES of America,
Appellee,**

v.

**Dalton Carl SMITH et al.,
Appellants.**

**Nos. 73–1599 to 73–1601.**

United States Court of Appeals,
Tenth Circuit.

Argued Jan. 7, 1974.

Decided May 1, 1974.

Rehearing Denied June 10, 1974.

Robert L. Pitler, Denver, Colo. (George Miskovsky, Oklahoma City, Okl., with him on the brief), for appellant, Dalton Carl Smith.

Alex Stephen Keller, Denver, Colo., for appellant, Michael J. Fitzgerald.

Isaac S. Willson, Wheat Ridge, Colo., for appellant, Jack L. Biggs.

Paul D. Cooper, Asst. U. S. Atty. (James L. Treece, U. S. Atty., with him on the brief), for appellee.

Before SETH and HOLLOWAY, Circuit Judges, and BRATTON, District Judge.

BRATTON, District Judge.

This appeal is from the convictions pursuant to 18 U.S.C.A. § 371 of Dalton Carl Smith, Michael J. Fitzgerald and Jack L. Biggs for conspiring to defraud the United States.

The one count indictment charged that the appellants wilfully and knowingly conspired to defraud the United States of and concerning its governmental functions and rights. The rights involved are its right to have the official business of the Small Business Administration conducted honestly and impartially, its right to have the personnel of the agency free to conduct business without exertion upon them of undue pressure and influence, and its right to the loyal and unbiased services, decisions, and performance of his duties of Jack L. Biggs in his capacity as a supervisory loan specialist, free from any corruption, partiality, improper influence, bias and fraud resulting from his personal and pecuniary interest in a business, American Western Plastics (A.W. P.), which was sought to be financed by others with the aid of a loan guaranteed by the Small Business Administration.

The indictment charged that Fitzgerald, as President of A.W.P. would apply for a loan in the amount of $350,000.00, such loan to be guaranteed by the S.B. A., and which loan was not paid when due, so that the S.B.A. had to pay on its guarantee. A further part of the conspiracy was that Biggs would shepherd the A.W.P. loan through the S.B.A., even though he had personal and financial ties to Fitzgerald and to Smith, both of whom had an interest in A.W.P. Also charged was that the interest of Smith would be concealed by the appellants, that there would be used fraudulent representation and undue influence in the preparation and processing of the loan, and that the appellants would use corporations to frustrate S.B.A. efforts to collect on the loan in the event of default.

Fifteen overt acts in furtherance of the conspiracy were listed in the indictment.

The facts as introduced by the prosecution are as follows. Appellant Smith moved to Denver, Colorado, and, in the summer and fall of 1970, began looking for a business to purchase. He opened an account at a Denver bank in September, and appellant Biggs, who had known Smith in California, was asked by Smith to call an official at the bank to give Smith a good reference, which Biggs did.

Smith proposed to buy any business located and for sale by exchanging for it certain stock. He did not want, however, to be the named purchaser of any business. He engaged one Herbert Oakes, for a share of any asset so acquired, to undertake the exchange for him. Oakes contacted James Betts, the president of A.W.P., and engaged in ne-

gotiations to buy the business in exchange for stock. He also took Biggs out one day to visit the plant, following a luncheon with Biggs and Smith at which they had discussed the possibility of an S.B.A. loan of $200,000.00 to finance the deal. Betts, however, did not want to finalize the deal offered by Oakes, preferring to have someone else handle the matter. Carroll Capital Corporation became involved in the proposed purchase of the business, and it, too, was acting in Smith's behalf as well as its own.

Howard Carroll, of Carroll Capital Corporation, contacted Fitzgerald in the fall of 1970 about another business matter. Fitzgerald indicated to him in late 1970 his desire to leave his law practice and go into business. This resulted in the assignment by Carroll Capital of its interest in the purchase contract for A. W.P. to him. He became on the contract finally signed the president of A.W.P. and, together with McAnnany, the accountant hired by A.W.P. after the contract was signed, the ostensible owner of all the stock in the company.

Fitzgerald and Biggs had known each other for a period of years. In addition to the other contacts between Fitzgerald and Biggs reflected herein, Fitzgerald made payment on a bank loan of Biggs in the spring of 1971 before the approval by the S.B.A. of the loan application.

Throughout the negotiations for the purchase of A.W.P., Betts understood that it was actually Smith who was to be the purchaser of the company. Smith told Betts that he would get through the S.B.A. the money to finance A.W.P. and pay off its indebtedness. Betts' company had suffered financial reversal, and, in the last few years he owned it, it had not shown a profit. It was having difficulty with the I.R.S. over its failure to pay withholding taxes, and a lien had been filed against it. It was ultimately closed down for a week but was reopened upon the assurances of Fitzgerald and McAnnany that the back taxes would be paid. When the contract was finally executed, Fitzgerald gave Betts certain airline stock, the value of which was guaranteed to Betts by Smith. However, Smith's name never appeared on the contract for the purchase of the company or on any document submitted to the S.B.A. for a loan to finance the company.

During the period before the S.B.A. loan for A.W.P. was approved, Smith discovered another plastics company, Polyco, and contacted one of its officials about its purchase. In the spring of 1971, Fitzgerald and Biggs met with the attorney representing the parent company. This attorney also spoke with Smith, and Smith, as well as Fitzgerald, told him that Smith was the principal for whom Polyco was being purchased.

The company was included in the S.B.A. loan application, and its inclusion raised the amount applied for to $350,000.00. It was not until after the loan had been approved that the loan papers were changed to reflect that part of the purchase price of Polyco was reflected by a $50,000.00 lien against its equipment. This change was approved by Biggs, who had been present when the deal was made and who at that time had learned part of the purchase price would be in the form of the lien.

At the time of its purchase, Polyco was not engaged in business and had not been since January of 1971. The closing payment for its purchase was May 20, 1971, and the $100,000.00 cash part of the purchase price was paid from the proceeds of the S.B.A. loan.

The statement in support of the S.B.A. application had no date stamp and there was no S.B.A. form detailing when the first contact with the borrower had been made.

Biggs' superior officer, the assistant chief of the division, had authority to approve loan applications up to $350,000.00. He had expressed reservations about the feasibility of the loan. Following the application's review by the screening committee composed of this officer, Biggs, and another loan supervisor named Bailey under the direction of Biggs, a feasibility report was

ordered. This came about because Bailey asked for approval of the loan on May 4, and the assistant chief of the division refused to give it without such a study. The feasibility study indicated that the business had a good chance of succeeding and that the proposed loan should be a good one.

Biggs was Bailey's immediate superior and the one who assigned the loan to Bailey for processing. Bailey's only authority was to make recommendations to his supervisor, Biggs. He had no authority himself to approve or disapprove loans.

Biggs normally had authority to approve loans up to $50,000.00 in amount. Under the line of authority established in the office, in the absence of his superior, he stood in that superior's place and had authority to approve a loan of any amount up to $350,000.00.

On May 13, 1971, while Biggs' immediate supervisor was out of town, both Bailey and Biggs advised the Regional Chief of the Financing Division that the loan had to be approved that day or the I.R.S. would close down the A.W.P. plant.

Under a procedure instituted by the chief of the division, all applications had to be reviewed by him after approval by the loan officer. He was in a meeting until 4:15 P.M. on the day in question and, so, upon the above advice, he waived the review, and Biggs' approval of the loan finalized it. Hence, the loan was approved in the absence of the person who had expressed reservations about it and who, had he been in the office that day, would have been the person who had to approve the loan application. Further, the evidence at trial established that the I.R.S. had not issued an ultimatum, so that it was not a fact that the loan had to be approved on the day Biggs approved it.

During the period before approval, the First National Bank of Clovis, New Mexico, had agreed to lend the money to A.W.P. upon an S.B.A. guarantee. The bank was anxious to attract new business for Clovis, and it wanted A.W.P. to locate there. Upon S.B.A. approval of the loan, the proceeds were disbursed to A.W.P. by the Clovis bank, and A.W.P. was moved to Clovis.

The proceeds of the loan were spent within two months, in part for purposes other than those set out in the loan conditions, and the business shortly thereafter failed. A proof of claim was ultimately filed in bankruptcy court by the S.B.A. and against Telstar, Incorporated, the successor company to A.W.P.

The loan application itself had been prepared by one Terry McAnnany, C.P.A. who began work for and became the vice-president of the company on April 1, 1971. The narrative in support of the application was prepared by Fitzgerald. Both men also submitted personal financial statements that did not accurately reflect their true financial condition.

The application itself reflected the assets of A.W.P. and Polyco, the company it proposed to buy and with which it would then merge. The projections prepared in support of the application were optimistic, requiring stringent management controls to achieve, and also included two accounts that the company was negotiating for but did not yet have.

Further evidence illustrated the relationships among the appellants. For example, in September and again in December of 1970, Smith made the statement that Biggs would do whatever Smith wanted him to do. In the fall of 1970, Smith wrote checks to Biggs on three occasions, which Biggs deposited in his account.

For his part, Biggs borrowed money from a bank in late 1970 and endorsed part of the loan proceeds over to Smith. In the spring of 1971, before the S.B.A. loan was approved, he borrowed further money from another bank securing the loan with stock held in Fitzgerald's name. In fact, there are several instances in the record of the appellants seeming to own and use, each as his own, the same shares of stock. Biggs

put one-half of the loan in the form of a cashier's check and endorsed the check. This check was deposited in A.W.P.'s account by the company's secretary, who was instructed to and did bring back $1,500.00 in cash to Fitzgerald.

In addition, Biggs visited the A.W.P. plant on several occasions before the loan application was made and discussed with Fitzgerald in person and Smith by telephone how the application should be prepared.

On appeal it is argued, as it was in the court below, that the indictment fails to charge a crime in that it fails to allege facts sufficient to charge a conspiracy to defraud the United States pursuant to 18 U.S.C.A. § 371. Among other things, it is contended that what is stated in the indictment does not amount to a crime and that the indictment is brought under the wrong statute.

The indictment fairly reads that the appellants conspired to defraud the United States of its governmental functions and its right to have the business of the S.B.A. conducted honestly and impartially, free from undue influence, and its right to have S.B.A. personnel transact business free from undue influence. The allegations of the indictment reflect not only the conduct of each appellant but also the agreement to engage in such activity for a common purpose. The provision of 18 U.S.C.A. § 371 pursuant to which the indictment was brought is broad enough to cover such a conspiracy, and the indictment as drawn states a crime. Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Hammerschmidt v. United States, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924); United States v. Peltz, 433 F.2d 48 (2d Cir. 1970), cert. denied, 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971).

There is no merit to the above or other attacks upon the indictment.

Appellants argue that a conspiracy was never established by independent proof, so that a variety of evidence relating to transactions and declarations were improperly admitted as to each of them. To the extent that this contention relates to the order of proof at trial, it is without merit. The order of admission of evidence in a conspiracy case is a matter within the trial court's discretion. Beckwith v. United States, 367 F.2d 458 (10th Cir. 1966); Nelson v. United States, 415 F.2d 483 (5th Cir. 1969), cert. denied 396 U.S. 1060, 90 S. Ct. 751, 24 L.Ed.2d 754 (1970); United States v. Elgisser, 334 F.2d 103 (2d Cir. 1964), cert. denied, 379 U.S. 881, 85 S. Ct. 151, 13 L.Ed.2d 87 (1964). The record reflects no abuse of such discretion.

As for appellants' challenge to the introduction of any such evidence on the basis that it was inadmissible because the conspiracy was never established by independent proof, the evidence relating to the financial dealings among the appellants furnishes such independent proof. See Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L. Ed. 593 (1953). Hence, the evidence complained of was admissible. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); United States v. Cox, 449 F.2d 679 (10th Cir. 1971), cert. denied, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972); Nelson v. United States, *supra*. The jury was properly instructed as to the proper use of such evidence as against each defendant at the close of the trial.

Next it is claimed that the evidence is insufficient to support appellants' convictions and, hence, that the denial of their post trial motions was error.

It is contended that the evidence shows nothing more than that the three appellants were friends and had had financial dealings with one another. It is further asserted that the evidence shows that the only intent they had was to make the business purchased a going

concern, in which endeavor they failed, i. e., there was no showing that dishonest means were used in the dealing with the S.B.A. and in the disbursement of the loan proceeds. They point to the fact that Smith and Fitzgerald put money of their own into the business trying to make it succeed.

 The evidence adduced at trial, together with the inferences to be drawn therefrom, must be viewed here in the light most favorable to the prosecution to determine whether there is substantial evidence from which a jury might reasonably find that an accused is guilty beyond a reasonable doubt. Jones v. United States, 365 F.2d 87 (10th Cir. 1966).

There is ample evidence in this case from which a jury might find that the appellants conspired to defraud the United States in the manner charged in the indictment.

Also objected to is the trial court's ruling that certain checks should be allowed in evidence. Copies of the checks were not furnished to the defense within five days after the pre-trial, as the court had ordered in the pre-trial order. Rather, they were given to the defense as the trial opened. The appellants argue that the checks, which reflected how part of the S.B.A. loan proceeds were disbursed for purposes not authorized by the S.B.A. loan, were immaterial and prejudicial evidence they were totally unable to meet because the records relating to them were in Colorado or elsewhere and not in Oklahoma City where the trial was being held.

The government showed the trial court that the relevance of the evidence had not become significant until the Friday preceding the Monday when the trial commenced, when it was furnished a supplemental list of witnesses the defense proposed to offer at trial. It also argued that the opening statements of the defense had indicated it was their contention that the evidence would show the purpose of the loan was to make the company an operating business, a contention which the checks directly refuted.

The government legitimately anticipated that this would be an issue in the trial at the time it received the supplemental list of witnesses and was entitled to put on its evidence relevant thereto.

Various errors are asserted relative to the trial court's instructions. A review of the instructions given, however, reflect that, when considered as a whole, they were proper and adequately explained the applicable law. United States v. Cooper, 464 F.2d 648 (10th Cir. 1972), cert. denied, 409 U.S. 1107, 93 S.Ct. 902, 34 L.Ed.2d 688, reh. denied, 410 U.S. 960, 93 S.Ct. 1424, 35 L. Ed.2d 696 (1973).

It is not necessary to discuss the other points raised on appeal, for the record reveals them to be lacking in merit.

Affirmed.