UNITED STATES of America,
Plaintiff-Appellee,

v.

William D. HERRING, Jack Ray Hargrove, Arthur D. Baca, George Gilbert Chapman and Manuel Padilla, Defendants-Appellants.

Nos. 77–1387 to 77–1391.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 9, 1978.

Decided July 17, 1978.

Rehearing Denied in Nos. 77–1387 through 77–1389 Aug. 9, 1978.

Richard J. Smith, Asst. U. S. Atty., Albuquerque, N. M. (Victor R. Ortega, U. S. Atty., and Don J. Svet, Asst. U. S. Atty., Albuquerque, N. M., on brief), for plaintiff-appellee.

John F. Quinn, Santa Fe, N. M., for defendant-appellant William D. Herring.

Orville L. Hardman, Parkersburg, W. Va. (John F. Quinn, Santa Fe, N. M., on brief), for defendant-appellant Jack Ray Hargrove.

David L. Norvell, Albuquerque, N. M., for defendant-appellant Arthur D. Baca.

John W. Boyd of Freedman, Boyd & Daniels, Albuquerque, N. M. (Jess Horn, Oklahoma City, Okl., on brief), for defendant-appellant George Gilbert Chapman.

Ralph C. Binford, Albuquerque, N. M., for defendant-appellant Manuel Padilla.

Before SETH, Chief Judge, and LEWIS and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is a case which involves a number of defendants, and which is concerned with the importation of a large quantity of marijuana from Mexico. The appellants are William D. Herring, Jack Ray Hargrove, Arthur D. Baca, George G. Chapman and Manuel Padilla, all of whom were convicted of possession with intent to distribute marijuana, contrary to 21 U.S.C. § 841(a)(1) (1976), and of conspiracy to possess with intent to distribute and to distribute marijuana, contrary to 21 U.S.C. § 846 (1976). An additional defendant, Donald Bearl Riley, was indicted but did not go to trial.

The main witness for the government was one Lonnie Brown, who testified that he had known Riley for a period of three years, because Riley had married his (Brown's) sister. In late November 1976, Riley contacted Brown and asked him if he knew anybody who wished to buy marijuana. Brown testified that he contacted the Drug Enforcement Administration (DEA) and reported that Riley had asked him about it, and thereafter Brown met with the DEA and volunteered to help them, in return for which DEA agreed to help him financially. Soon thereafter, Brown introduced Riley to the DEA agents and an agreement was reached, the result of which was that Brown and Riley flew to Mexico. After some abortive efforts, Riley telephoned Brown in late December, saying that the deal was ready and that Brown was supposed to go to Albuquerque to see the place where the deal was to take place. Later, an unknown person called Brown on the phone and said that the location had been changed to Conchas Dam.

On December 30, Brown drove a pickup with a camper shell to Conchas Dam. On that evening, he met Donald Bearl Riley, Arthur Baca, Jack Hargrove, William Herring and Manuel Padilla at the airstrip near Conchas Dam. Marijuana was stacked on the runway. Defendant Hargrove asked Brown if he had the money and if it were good, and he answered that the money was on the way. The marijuana was loaded into a pickup truck driven there by Brown.

Brown and the defendants went to a bar that was close by, where they drank beer and played pool. Brown said that Riley and Hargrove had told him that the plane which had flown the marijuana from Mexico left it off at Conchas Dam and returned to Tucumcari airport. Riley said that the pilot and Hargrove had flown it in from Mexico. Brown and Riley left the bar in the station wagon after a few hours, to return to the airport to meet the DEA agents. Soon thereafter, the bar closed and the four remaining defendants left there in the pickup truck.

Gary Walsmith, a patrolman of the New Mexico State Police, at the direction of a superior, Officer Boarman, had been maintaining surveillance at a highway intersection. It had been explained to him that a large quantity of marijuana was to be brought into the Conchas Dam airstrip. While he was maintaining the surveillance, he had seen only three automobiles pass by prior to the pickup truck with the camper shell coming by. The headlights of the truck illuminated the place where Walsmith was parked and so he decided to follow it. He drove up behind the truck so that his lights penetrated the window of the camper shell so that he could observe some packages, which he believed from their appearance to contain marijuana. Following this view, he decided to stop the truck. He turned on his flashing lights to do so. When the truck stopped, Herring and Padilla fled, whereas Baca and Hargrove remained. Herring, however, was caught almost immediately and Padilla was arrested the next morning. Walsmith arrested Baca and Hargrove and searched the truck. He also seized the packages which, of course, proved to contain marijuana.

Riley was arrested in the station wagon at the airport. In that station wagon there was a flight manual for a Piper Navajo Aircraft together with the checkbook of the defendant Chapman, who proved to be the pilot of the aircraft. Also, there was a rental agreement for the aircraft between Chapman and Catlin Aviation of Oklahoma City. There was evidence that Chapman

was at the Tucumcari airport earlier that same evening refueling the airplane. He was seen by DEA Agent Boarman, who, based upon a tip received from the United States Customs Service, had been looking for the Piper Navajo. The plane had the registration number which had been given to Chapman. Chapman left a note for Hargrove telling him where he (Chapman) would be staying, so after the other defendants had been arrested, Chapman was arrested by Boarman at the hotel.

The main points raised on this appeal on behalf of Baca, Hargrove, Herring and Padilla are the following:

1. The alleged error on the part of the trial court in denying the motion to suppress the seized marijuana on the ground that the search and seizure was a violation of the Fourth Amendment.

2. Each of the defendants, including not only Herring and Hargrove, but also Padilla, Chapman and Baca, contends that the court erred in denying their several motions for severance due to the disproportionate weight of the evidence and because of the fact that there was evidence admissible against some and inadmissible against others.

3. All of the defendants claim that the trial court erred in receiving evidence which they maintain was withheld from them contrary to an open file agreement, whereby the government agreed to allow the defendants access to its files in return for their agreement to waive preliminary hearing. They point to a statement by the informant, Lonnie Brown, and a hotel registration slip signed "Bill Davis."

It is also contended on behalf of all of the defendants that the trial court erred in denying defendants' objections to introduction of the photographic array which is used for the identification of some of the defendants; it is also maintained that the in-court identification based upon the allegedly illegal photographs was error.

Other trial errors are raised in addition to those mentioned, including misinstructions in some instances, insufficiency of the evidence, limitations on cross-examination, etc. It would seem that the main objection deals with the failure to suppress the seized marijuana on the ground that the question is of constitutional magnitude. The seizure of this is, of course, the key to the case against all of the defendants.

The guilt of appellant Chapman, the airplane pilot, is dependent on the validity of the seizure of the marijuana by the surrounding circumstances.

The trial court ruled that the search was not illegal and accepted the marijuana into evidence. If this was correct, the evidence in support of guilt was legally sufficient. Accordingly, this is the pivotal issue in the case.

The defendant Chapman, who is charged by reason of the government's theory that he piloted the airplane which transported the marijuana, contends:

1. That the evidence was insufficient to establish his participation in the conspiracy, whereby evidence would be admissible against him and, particularly, that involving statements made by alleged co-conspirators prior to any involvement by him.

2. Insufficiency of the evidence to establish Chapman's guilt of possession.

3. Error of the court in denying Chapman's motion to suppress evidence taken in the course of the search of his hotel room.

4. Failure of the court to give the defendant Chapman's requested instruction.

I.

■ Was there probable cause to justify the stopping of the truck and the arrest of its occupants?

Officer Walsmith had been told by his superior, Officer Boarman, to conduct surveillance of the area near the Conchas Dam airport. Boarman advised Walsmith that there was to be a large amount of marijuana flown into the area and gave him the description of the plane together with its identification number. While conducting the surveillance, Walsmith saw the pickup turn south on State Road 129, the intersec-

tion of which he was watching. According to his testimony, the pickup was going very fast. He pursued it, but did not attempt to stop it, which he had a perfect right to do since it was a public highway. *Cf. United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). While following the pickup, he observed burlap type bags containing kilo sized packages of marijuana. After seeing this, he brought the vehicle to a stop and in doing so he turned on his emergency lights. At the place where the vehicle stopped, two of the occupants fled toward a fence. Finally, after exiting his vehicle, he smelled the odor of marijuana.

This background constituted initially suspicion and, finally, probable cause for the arrest.

We cannot disregard the fact that Walsmith had been alerted to the landing of an airplane carrying the marijuana. That is why he was conducting the surveillance. There was cause for suspicion when the pickup truck passed by him going "very fast." Once he was able to get close enough so that his lights could shine in the window of the pickup, he was able to see the burlap type bags which contained the bricks of marijuana. This strengthened his suspicion and fully justified his stopping the vehicle. There existed ample basis to arouse his suspicions that the driver of the vehicle was violating the law. *United States v. McDevitt*, 508 F.2d 8, 10 (10th Cir. 1974). After Walsmith left his police car he observed the flight of two of the occupants. This raised an inference that some guilt existed and added to his total knowledge. Finally, the sight and smell of the marijuana added the requisite knowledge of the existence of probable cause.

This was not any random vehicle check. It was a systematic effort which resulted in the acquisition of the requisite knowledge. He was authorized to seize the marijuana which he said that he had seen and later smelled. *See, for example, Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *Ker v. California*, 374 U.S. 23, 43, 83 S.Ct. 1623, 10 L.Ed.2d 726

(1963) (opinion of Clark, J.). The doctrine applies to items which can be seen through windows and doors of automobiles. *See United States v. Cheatwood*, 575 F.2d 821 at 824–25 (10th Cir. 1978); *United States v. Wagner*, 497 F.2d 249, 252 (10th Cir. 1974); *United States v. McDaniel*, 550 F.2d 214, 218 (5th Cir. 1977). The odor of marijuana provided an additional basis for Walsmith's suspicions that a crime had been committed. *See United States v. Sigal*, 500 F.2d 1118, 1122 (10th Cir.), *cert. denied*, 419 U.S. 954, 95 S.Ct. 216, 42 L.Ed.2d 172 (1974); *United States v. Bowman*, 487 F.2d 1229 (10th Cir. 1973).

Unquestionably there was ample evidence to constitute probable cause so as to justify the arrest and the search incident thereto. *United States v. Clark*, 559 F.2d 420, 424 (5th Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977). The evidence was admissible.

## II.

Did the introduction of Brown's witness statement violate the agreement of the district attorney to maintain an open file and thereby cause the trial court to err in receiving the statement in evidence.

The argument here arises from Brown's witness statement made to the DEA containing all of the facts. The content of the statement coincided with the testimony which was given. However, it was not part of the government's file. Instead, it was in the DEA file. The Brown statement had been given to DEA officers on January 3, 1977. The statement was not introduced nor was it referred to by the government, notwithstanding that Brown had testified. It was first brought forward in cross-examination by the attorney for appellant Herring, who questioned Brown at some length about the statement. On redirect examination the statement was offered by the government. The question whether the statement should have been furnished at an earlier time as part of the open file agreement is not easy to answer. In the absence of an open file agreement, a statement by a government witness or pro-

spective government witness is not discoverable. The first time that the government must bring such a witness statement to the surface is after the witness has testified on direct examination. He must then produce it for the purpose of aiding defense counsel in cross-examining under 18 U.S.C. § 3500(b) (1976). The saving grace is that the statement *was* not secreted. It was made available to appellants shortly before the trial started. This fact does not prevent the contention that the general agreement for an open file called for the court to impose a sanction against the government, like refusal to allow the statement in evidence. It is also argued that the statement was hearsay and that it should be excluded on that ground.

▮ Prior to the adoption of the Federal Rules of Evidence, courts were more reluctant to admit prior consistent statements. A witness statement ordinarily was not received except for purposes of impeachment even on redirect examination. It was considered hearsay and to have a tendency to bolster the testimony of the witness. But now under Rule 801(d)(1)(B) of the Federal Rules of Evidence, the statement of a witness which is consistent with his testimony is not considered hearsay if it "is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." The trial court has discretion to determine whether the statement is being offered in rebuttal of the contention that his testimony is of recent fabrication or is brought about as a result of improper influence or motive. *See, e. g., United States v. McGrath*, 558 F.2d 1102, 1107 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978); *United States v. Goodson*, 502 F.2d 1303, 1307 (5th Cir. 1974); *United States v. Zito*, 467 F.2d 1401, 1404 (2d Cir. 1972). The questions by the defense to Brown on cross concerning his compensation from the government for testifying and the questioning which carried the suggestion that his testimony was inconsistent with the statement and was thus fabricated, all justified reception of the prior statement. Also, it was for the trial court to determine wheth-

er the statement should be excluded or whether sanctions should be imposed because of the statement not being in the district attorney's file. We perceive no abuse of discretion by the trial judge in allowing the statement to be used in the present circumstances, first, and especially since the defense sought to use it for their own advantage.

▮ It is also contended that it was error to introduce in evidence the hotel registration slip signed "Bill Davis" in the Hilton Inn in Albuquerque, together with the other registration slip signed by defendant Baca. The registration slip was not considered significant (by the government) in advance of trial. The government did not know who Bill Davis was until a hotel desk employee testified that Davis was wearing a yellow cap with the name of a tractor company on it when he checked into the hotel. This description coincided with that given by other witnesses of the hat which defendant Herring was wearing when he was arrested. The government moved for an order requiring Herring to furnish a handwriting exemplar. This motion was granted. Later, a handwriting expert testified that it was Herring's handwriting on the hotel registration slip. This was not provided to the appellants until the first day of the trial. The relevance of the slip was not known prior to delivery. As we see it, then, the registration slip was not a violation of either the open file policy or the appellant's discovery rights. *See United States v. Smith*, 496 F.2d 185, 190 (10th Cir.), *cert. denied*, 419 U.S. 964, 95 S.Ct. 225, 42 L.Ed.2d 179 (1974).

## III.

▮ Defendants Padilla, Herring, Hargrove, Baca and Chapman have all joined in the assertion that it was error to deny their motions for a severance. They point to the limiting of cross-examination together with the limitations placed on closing arguments, which infringed their rights to a fair trial. The argument is that severance should have been granted because of the length and

complexity of the trial and the need for continuously hurrying it along. Fed.R. Crim.P. 8(b) authorizes several defendants to be indicted and tried together "if they are alleged to have participated in the same act or transactions constituting an offense or offenses." The court may grant a severance if it appears that the defendant or the government is prejudiced by a joinder. The granting of such a motion is in the discretion of the trial court.

First, we consider the claim that the defendants were prejudiced by the limitations that were placed on cross-examination and on closing arguments. The record does not bear this out. The court, to be sure, limited repetition in the questioning, but this was within the court's rights. *See United States v. Heath*, 580 F.2d 1011 at 1022–1023, 1025–1026 (10th Cir. 1978); *United States v. Jones*, 578 F.2d 1332 at 1339 (10th Cir. 1978); *United States v. Speir*, 564 F.2d 934, 938 (10th Cir. 1977) (en banc). The closing arguments were also limited, but this was not a prejudicial limiting. A total of 75 minutes was allowed, which, considering the nature and character of the case, strikes us as ample time for the presentation of the case as to the defendants as a whole and as to each of them. Here again, the object was to prevent or avoid needless repetition. We do not consider this as constituting an abuse of discretion. *United States v. Gleeson*, 411 F.2d 1091, 1096 (10th Cir. 1969). Nor do we agree with the further argument that severance should have been granted because there was evidence admissible against some of the defendants and inadmissible as to others. This is frequently argued in the multidefendant case. The problem usually is whether the trial court has, by proper instructions, limited the testimony applicable to each defendant. In a conspiracy case, however, in which the statements are made in the course and scope of the conspiracy, the statement of one co-conspirator is fully admissible as to another. So if the jury finds that there is a conspiracy, as it did here, while the conspiracy is going on, there is no great problem. It does not appear that

there is any prejudice in connection with the statements described by Brown in his own testimony, statements which had been made to him by the other defendants while the conspiracy was ongoing. These were admissible.

■ Hargrove makes a special point, that is, that he was prejudiced because his lawyer was not allowed to comment on the failure of his codefendants to testify. Hargrove did testify. The ground advanced, namely that defendant was deprived of taking advantage of the failure of other defendants to take the stand, is not a sufficient reason for granting a severance. It would not be possible to comment, in any event, because the failure of the codefendants to take the witness stand would not be part of the record in Hargrove's case if he were tried separately. Hargrove's testimony was consistent with the claimed innocence of the other defendants. He denied knowledge that anyone had possessed or conspired to possess marijuana, and so the conflict between the several defendants from the standpoint of their defenses at least was not great. *See United States v. Haldeman*, 181 U.S.App.D.C. 254, 294–96, 559 F.2d 31, 71–73 (1976) (en banc), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

■ Chapman and Padilla contend that they were entitled to have their trials severed from the others because the evidence as to them was relatively insubstantial in comparison with that applicable to the other defendants. When, as here, there is a conspiracy in which several defendants are involved, an interest of the government is served by having a joint trial so as to avoid repetition. The court did not abuse its discretion in denying the motions for severance.

## IV.

The contention of Chapman, the person who allegedly piloted the airplane, is that Boarman's arrest of him and the search of his motel room were violations of the Fourth Amendment. Agent Boarman had

seen Chapman at the Tucumcari airport paying for gasoline for the airplane. Boarman recognized the airplane as having the same number that his source had communicated to him as being the plane carrying the marijuana. Chapman, as noted above, had written a note to Jack Hargrove telling him where he was in Tucumcari. In the automobile in which Riley was arrested, Officer Warren of the New Mexico State Police found several items which connected Chapman with the rental and flight of the airplane. Following Riley's arrest, Boarman and Warren went to the Pow Wow Inn, where Chapman said he was going to stay. They knocked on the door of the motel at about 2:30 or 3:00 a. m. on December 31. When Chapman answered the door he was placed under arrest. At this time he was given advice concerning his rights and was asked for the key to the airplane. Chapman obtained the key from a dresser and handed it to Boarman. Although a search was made of the room, nothing else was seized.

▆▆▆ Chapman maintains that they could have obtained a warrant. Undoubtedly they could have done so, for there was time. There can be an arrest without a warrant where the officer has probable cause that a felony has been committed. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Gerstein v. Pugh,* 420 U.S. 103, 113–16, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). We conclude that there was probable cause.

▆▆▆ We need not decide whether the arrest was invalid because of its having been made in a private place because it was not. Chapman was arrested in the entrance to his motel room. It was unnecessary for the officers to enter the room. It cannot be said, then, that it was made in a private place. *Cf. United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976).

Inasmuch as the arrest was valid, the search within the area of Chapman's immediate control was also valid, for this would be an area in which he could possibly have gained possession of a weapon. *Chimel v.*

*California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Chadwick,* 433 U.S. 1, 14, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

### V.

Was the in-court identification rendered invalid because of the previous identification by Brown of Photographs?

▆▆▆ The rule is that identification of a defendant based on photographs is to be excluded if the use of photographs is unnecessarily suggestive and identification by the witness is unreliable. The elements which enter into a determination of reliability are the opportunity of the witness to see the individual at the time that the crime was committed, the attention given by the witness to the person at the time, the accuracy of the description prior to seeing the photographs, his level of certainty at the confrontation, plus the time between the crime and the confrontation. The Supreme Court listed these tests in *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), wherein it was held that the photograph was unnecessarily suggestive because the only picture shown was that of the defendant. Also, there was no explanation for failure to use a photographic array or a lineup. *Id.* at 102–04, 97 S.Ct. 2243. Here, Brown identified through pictures the defendants including Riley, who had been his brother-in-law, and a picture of Chapman, whom he had never seen and did not identify, so it cannot be argued that the photographs were suggestive. The factors or standards set forth in *Brathwaite* are satisfied here. This was not an instant confrontation. Brown was with the men for two or three hours on December 30, 1976. He was also aware that he would be called upon to identify them. We see no merit in the argument that the identification in this case was unreliable.

It is also urged on us that the refusal of the court to allow surrebuttal testimony by Hargrove was error. This ruling was a matter of trial court discretion and there was no abuse of discretion.

\*     \*     \*     \*     \*     \*

■ Chapman and Padilla emphasize the insufficiency of the evidence as to them. We see no merit in either of these arguments.

\* \* \* \* \* \*

■ We have also considered the contentions that there were errors in the jury charge in refusing to give requested instructions such as that which Hargrove requested (Number 11), which told the jury that it must acquit if it found that he was present at the Conchas Dam airstrip to sell sham cocaine. This was covered by the court's instruction that a defendant could not be convicted of a charge other than those contained in the indictment. Also, we have considered the objections as to the instructions given on intent and the failure to pinpoint the specific theory of the case in the intent context. We see no merit in these objections either since the trial court's instructions on intent were sufficient.

■ Chapman objected to the failure to give his requested instruction that each defendant must be shown to have had knowledge of the illegal possession of marijuana, and guilty knowledge of one defendant could not be imputable to the others. The court was careful to instruct the jury that the burden was on the government to prove that each defendant had joined the conspiracy and that it must be proven also beyond a reasonable doubt that the conspiracy was knowingly formed and that the individual defendant willfully participated in the illegal plan and that each individual's acts had to be considered in deciding whether this requirement had been satisfied.

We have considered the defendants' remaining contentions, and find none of them to be meritorious.

The instructions were valid. The judgment of the district court is affirmed.