UNITED STATES of America,
Plaintiff-Appellee,

v.

Joseph Paul FRANKLIN,
Defendant-Appellant.

No. 81–1343.

United States Court of Appeals,
Tenth Circuit.

April 12, 1983.

Vicki Mandell-King, Asst. Federal Public Defender, Denver, Colo. (Michael G. Katz, Federal Public Defender, Denver, Colo., with her on the brief), for defendant-appellant.

Irving Gornstein, Atty., Washington, D.C. (Wm. Bradford Reynolds, Asst. Atty. Gen., Walter W. Barnett and Harold Levy, Attys., Dept. of Justice, Washington, D.C., with him on the brief), for plaintiff-appellee.

Before McWILLIAMS, LOGAN and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Joseph Paul Franklin was convicted by a jury of two counts of violating 18 U.S.C. § 245(b)(2)(B) (1976)[1] by shooting and killing two black men who had been using a public facility. On appeal, Franklin contends that: (1) the district court erred in admitting evidence of a prior act under Fed.R.Evid. 404(b); (2) the court admitted certain testimony in violation of his Fifth and Sixth Amendment rights; (3) the court abused its discretion in allowing a Government witness to testify despite the Government's disregard of its open-file discovery policy; (4) the court erred in denying his motion for a new trial; and (5) the evidence was insufficient to support the conviction. We affirm.

## I.

## FACTS

Franklin's trial for these shootings lasted seven days and included the testimony of some eighty witnesses. We present here a summary of the evidence viewed in the light most favorable to the Government. *See United States v. Blitstein,* 626 F.2d 774, 776 (10th Cir.1980), *cert. denied,* 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981).

On August 20, 1980, two black men, David Martin and Theodore Fields, were jogging with two white women at Liberty Park in Salt Lake City. Martin and Fields were shot and killed between 10:00 and 10:15 p.m. at the intersection of Ninth South and Fifth East as they left the park.

Franklin is 5′ 11″ tall. At the time of the shootings he had shoulder-length blond hair. He owned a metallic brown 1975 Camaro with extra high gloss and red pin stripes. It had chrome mag wheels, four tires of the same make with white raised letters, plaid vinyl seat covers, dual exhausts, and a spoiler.

Several witnesses described a car and driver near Liberty Park on the night of the shootings. One of the women who was jogging with Fields and Martin noticed a car that "looked like a Camaro," slowly driving the wrong way on a one-way road through the park. She said it looked new and described it as "pretty shiny." Rec., vol. V, at 68. Sefo Manu, who owns a Camaro himself, noticed a Camaro driving the wrong way on the park road. He followed the car as it left the park and turned into a lot. Manu described it as newer than his own 1974 Camaro, dark maroon with red trim, mag wheels, writing on the tires, a spoiler, and a dual exhaust. He said the driver had shoulder-length hair.

Gary Spicer and John Fellows, who both lived near the park, also noticed a dark Camaro with mag wheels. Spicer saw the car park in the lot between his house and the intersection where the joggers were shot, and saw a man about six feet tall get out of the car. Fifteen minutes later Spicer heard shots, saw a flash coming from the lot, and saw the victims at the intersection. He shined a light on a man in the lot who was holding what appeared to be a gun. When the shooting stopped, the man ran to the Camaro, threw a "long object" into the trunk, and drove off. Another witness saw an "orange-brown" Camaro pull out of the lot after the shooting ceased. Two others

---

1. 18 U.S.C. § 245(b) (1976) states in pertinent part:

   "Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

   . . . .

   "(2) any person because of his race, color, religion or national origin and because he is or has been—

   . . . .

   (B) participating in or enjoying any benefit service, privilege, program, facility or activity provided or administered by any State or subdivision thereof . . .

   . . . .

   shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life."

described a man wearing a baseball cap and carrying what appeared to be a rifle. Witnesses heard between five and seven shots.

The Government introduced considerable tangible and forensic evidence at trial. The police had found six cartridges near the spot where Spicer had seen someone. Ballistics tests showed that the bullets had all been fired from one rifle, a type that could fire seven shots and only eject six cartridges. The doctor who performed the autopsy on Fields and Martin testified that their wounds were consistent with seven shots being fired from the field. Tire prints found in the lot were similar to prints that would have been left by Franklin's tires.

Several witnesses testified about Franklin's activities in Salt Lake City in the ten days immediately before the shooting. He stayed in at least six motels, registering under assumed names and asking motel employees whether his room had ever been occupied or cleaned by blacks.

Mickey Farman-Ara testified at length about an evening she spent with Franklin a few days before the shootings. Franklin told her that he hated blacks. She told him that she disliked two black pimps and they discussed killing them. Franklin showed her two handguns and she noticed a rifle in the closet of his motel room. While driving past Liberty Park, Farman-Ara told Franklin that the east side of the park was predominantly white, the west side was predominantly Mexican, and the middle was where "the blacks and the pimps all hang out . . . to pick up the girls." Rec., vol. VI, at 464. Later they again discussed killing the two black pimps. Farman-Ara warned Franklin that he would be caught. He disagreed, saying that "you follow them and you pick out the right time [and] even if it's in a crowd you can just shoot them, and if there's enough cars or something hiding you, . . . you can get away with it." Id. at 474.

A day or two before the murders, Franklin stopped his car and called to Lori Jacobs, a lifeguard who was on her way to her job at Liberty Park. He told her that "he didn't go around Liberty Park because there were too many niggers in Liberty Park." Id. at 498. He said, " 'I'll come and visit you in Liberty Park but I won't go swimming because there's niggers that swim there.' " Id. A day or two later, Jacobs saw Franklin driving his Camaro through the park.

About 5:30 the evening of the shooting, Franklin picked up two white women who were hitchhiking near Liberty Park. He told them "that he hated to see white girls with niggers because it wasn't right." Id. at 552. About 9:00 that night the two women saw Franklin driving his Camaro near the intersection where Fields and Martin were shot.

Other witnesses testified about Franklin's activities after the shootings. On September 25, Franklin was arrested in Florence, Kentucky, after a routine check erroneously indicated that his car was stolen. The police found two handguns and two rifles in his motel room. When questioned at the police station, he at first denied ever having been to Utah, then said he had been there five years before, and then conceded he had been there in August. He became nervous when the interrogating officer began to ask about a "double homicide" involving his Camaro there. The officer was called away from the room and Franklin escaped out a window. Franklin hitchhiked to Cincinnati, where he had his hair cut and dyed and bought all new clothes.

In late August or early September Franklin had visited his former wife, Anita Cooper, in Birmingham, Alabama, driving a brown Camaro. In late September or early October, he visited Cooper again. This time he was on foot. His hair was dyed and styled differently and he was wearing new glasses. When she failed to recognize him he laughed and said, " 'Well, . . . if I could fool you, I could fool anyone.' " Rec., vol. VII, at 804–05. During their conversation, Franklin "was just talking about Salt Lake City and two joggers and all. And he said it would be funny, you know, it would be funny if I did it . . . ." Id. at 804.

Franklin was arrested in Florida on October 28. He told the agent who questioned him that he had owned several weapons, particularly handguns and high-powered rifles, and that he considered himself to be an expert in their use. The agent testified:

"Mr. Franklin stated that he considered himself a racist, and he expressed a very strong dislike for the black people and for Jews. And he specifically also stated that he had no remorseful feelings at all at the deaths of these people.

. . . .

"... He specifically talked about the mixing of the black and white races, and expressed with very strong emotion his disapproval of such mixing."

*Id.* at 739. Franklin refused a hamburger the agent offered him because the agent could not "guarantee [him] that that hamburger [was] not cooked by a nigger." *Id.* at 752. Franklin acknowledged having been in Salt Lake City from August 15 to August 22, 1980, and described four guns that he had had with him. He said that he had been to Liberty Park but had stopped going because he had seen a lot of racial mixing there. Franklin denied having been involved in the murders.

After his arrest, Franklin telephoned Anita Cooper from the police station in Tampa. Near the beginning of the conversation he said, "'Have you heard about the two joggers in Salt Lake? ... I did that.'" *Id.* at 806.

While he was in the Salt Lake County Jail awaiting trial, Franklin admitted killing the two joggers to two fellow inmates, Richard Hawley and Robert Herrera. He told Hawley "that he had gone out to a park ... and noticed that there was people out there, blacks and whites associating together, and that he had decided that he was going to do something about it." *Id.* at 832. He also told Herrera that he did not like seeing "a lot of blacks and whites together" in the park, and so drove around to find a place to park and a place "where it would be best to get a good shot at somebody." *Id.* at 855–56. He threw his rifle in his trunk and drove away. Later he sold the rifle at a flea market in San Rafael, California. Herrera recited other details of the shooting which he alleged Franklin had told him.

## II.

## OTHER ACT EVIDENCE

Franklin contests the introduction of evidence that he had assaulted an interracial couple in the Washington, D.C. area in September 1976. Aaron Miles, who is black, testified that he had been to a play one evening with Carol Eastwood, who is white. On their way home a man drove behind their car for about fifteen minutes, finally following them into a dead end. When Miles asked the man if he was following them, the man replied: "'Following you? No one's following you, boy. This is a free country. I can go where I want.'" Rec., vol. VII, at 725. The man then sprayed Miles and Eastwood with mace. A Montgomery County, Maryland police officer testified that the man, who was later identified as Franklin, told him that he thought interracial interaction was wrong.

■ Although the general rule is that evidence of other acts or crimes is inadmissible, such evidence may be admitted for limited purposes. *See generally United States v. Burkhart,* 458 F.2d 201 (10th Cir. 1972) (en banc). Rule 404(b) of the Federal Rules of Evidence provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Fed.R.Evid. 404(b). A trial court has broad discretion to determine whether, under Fed. R.Evid. 403, the probative value of evidence outweighs the risk of unfair prejudice. *United States v. Jacobson,* 578 F.2d 863, 867 (10th Cir.), *cert. denied,* 439 U.S. 932, 99 S.Ct. 324, 58 L.Ed.2d 327 (1978); *United States v. Nolan,* 551 F.2d 266, 271 (10th

Cir.), *cert. denied,* 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977). The trial court here allowed the Government to introduce evidence of the mace incident as probative of motive.[2] Before admitting the evidence, the court properly heard Miles' testimony out of the presence of the jury. Both before Miles testified and again in the final jury instructions, the court cautioned the jury that the testimony was offered on the question of motive only. Under the circumstances, we find no abuse of discretion.

Franklin argues that the evidence should not have been admitted to show motive because "Franklin's racial motivation was not an issue at trial, but rather admitted throughout the trial. Instead Franklin denied participation in the acts which constitute the crime." Brief of Appellant at 22.

■ Intent is an element of the offense Franklin was charged with. The statute proscribes willfully injuring "any person *because of* his race." 18 U.S.C. § 245(b) (emphasis added). Thus the Government was required to prove not only that Franklin killed Fields and Martin but that he did so because of their race. Even though Franklin did not deny his racism, a racial motive was still an element of the crime that the Government had to prove. It is not necessary for "the defendant to have raised the issue of intent for it to be an issue in the case where, as in this case, the crime for which the defendant is charged requires proof of specific intent." *United States v. Engleman,* 648 F.2d 473, 478–79 (8th Cir.

1981). *See also United States v. Buchanan,* 633 F.2d 423, 426 (5th Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 301 (1981); *United States v. Williams,* 577 F.2d 188, 192 (2d Cir.), *cert. denied,* 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978); *United States v. Adcock,* 558 F.2d 397, 402 (8th Cir.), *cert. denied,* 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977).

In *United States v. Webb,* 625 F.2d 709, 710 (5th Cir.1980), the defendant was charged with willfully damaging a helicopter as it flew over his property. His only defense was an alibi, yet the court held other act evidence admissible on the intent issue. The court stated that where intent is not inferable from the nature of the act "and the defendant fails to give enforceable pre-trial assurances that he intends not to dispute criminal intent, the Government's case-in-chief may include such extrinsic offense evidence as would be admissible if intent were actively contested." *Id.* at 710. Franklin gave no such pre-trial assurances here.[3]

■ Franklin offers two further arguments for exclusion of the prior act evidence. First, he suggests that the probative value of the mace incident was "significantly diminished by the weight of the other evidence on this issue." Reply Brief of Appellant at 3. Miles' testimony was introduced on the fifth day of a six-day trial. The trial judge was in the best position to evaluate its probative value in the context of all the evidence presented. *See United*

---

2. The Government also argued at the bench conference that the evidence could be admitted as probative of identity but the court rejected that argument. On appeal the Government relies chiefly on its motive argument, although it asserts in a footnote that the evidence could have been introduced to show identity as well. Brief for the United States as Appellee at 27 n. 5. Because we hold the evidence admissible on the issue of motive, we do not reach the question whether it would have been admissible to show identity, although Franklin emphasizes this issue in his brief.

3. In *United States v. Manafzadeh,* 592 F.2d 81 (2d Cir.1979), the Second Circuit held that other act evidence should not have been admitted on the issue of intent. *Id.* at 87. The defense

had not been that the defendant had innocently or mistakenly been involved with the bad check scheme but that he had not been involved at all. *Id.* at 85. Defense counsel even offered to stipulate that *if* the defendant had participated *then* he had acted with the requisite criminal intent. *Id.* at 87. Here, although Franklin may not have actively disputed his racism, he did not offer to stipulate that element of the crime.

Franklin also relies on *United States v. Powell,* 587 F.2d 443, 448 (9th Cir.1978), where the court stated that "[w]hen a defendant denies participation in the act or acts which constitute the crime, intent is not a material issue for the purpose of applying Rule 404(b)." To the extent that *Powell* can be read to be inconsistent with our analysis, we decline to follow it.

*States v. Engleman,* 648 F.2d 473, 479 (8th Cir.1981) (admission not an abuse of discretion where "[t]he evidence concerning intent and motive was not so great as to make the evidence of similar crimes cumulative"); *see also Havelock v. United States,* 427 F.2d 987, 990–91 (10th Cir.) ("It would be awkward to refuse evidence bearing on an element of the crime because, through hindsight, we are able to say that it proved unnecessary in the end."), *cert. denied,* 400 U.S. 946, 91 S.Ct. 252, 27 L.Ed.2d 251 (1970).

■ Second, Franklin argues that evidence of the mace incident should have been excluded because the incident was too remote in time from the charged offenses. The incident occurred in September 1976, almost four years before the shootings in August 1980. "[T]here is no absolute rule regarding the number of years that can separate offenses. Rather, the court applies a reasonableness standard and examines the facts and circumstances of each case." *Engleman,* 648 F.2d at 479 (no abuse of discretion when district court admitted evidence of crime that defendant committed thirteen years before charged offense). *See also United States v. Dudley,* 562 F.2d 965 (5th Cir.1977) (within six years); *United States v. Zeidman,* 540 F.2d 314 (7th Cir.1976) (five years); *United States v. Barash,* 412 F.2d 26 (2d Cir.) (five years), *cert. denied,* 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969). *But see United States v. Gilliland,* 586 F.2d 1384 (10th Cir.1978) (prior Dyer Act convictions 14 to 34 years old insufficiently relevant to instant charge); *United States v. Burkhart,* 458 F.2d 201 (10th Cir.1972) (en banc) (prior Dyer Act convictions 4 and 15 years old insufficiently relevant). Under the circumstances of this case, the trial court's determination that the evidence was relevant, probative, and not unduly prejudicial was not an abuse of discretion.

## III.

### ANITA COOPER'S TESTIMONY

Franklin asserts that the Government's use of Anita Cooper's testimony about the telephone call he made to her the night he was arrested in Tampa violated his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel. Cooper testified that early in the telephone conversation Franklin admitted murdering the two joggers.

### A. Sixth Amendment

Franklin's Sixth Amendment claim is based on *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In *Massiah,* the Supreme Court held that a defendant's Sixth Amendment right to counsel was violated "when there was used against him at his trial evidence of his own incriminating words, *which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.*" *Id.* at 206, 84 S.Ct. at 1203 (emphasis added). Contrary to Franklin's suggestion, *Massiah* is inapplicable here, both because Franklin's right to counsel had not yet attached at the time of the conversation in question and because his incriminating statement was not one "which federal agents had deliberately elicited from him." *Id.*

■ "[A] person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972). Like Kirby, and unlike Massiah, Franklin had been arrested but adversary judicial criminal proceedings against him had not yet been initiated, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 689, 92 S.Ct. at 1882. Thus, under the clear holding of *Kirby,* Franklin's right to counsel had not yet attached when he made his incriminating remark to Cooper.

■ Furthermore, even had Franklin's right to counsel attached, his statement to Cooper would still be admissible because it was not deliberately elicited from him by federal agents. *See United States v. Henry,* 447 U.S. 264, 276, 100 S.Ct. 2183, 2189–2190, 65 L.Ed.2d 115 (1980) (Powell, J., con-

curring). In *Henry,* a government agent contacted a sometime informant housed in the same cellblock with Henry. The agent instructed the informant to be alert to any statements made by certain federal prisoners, and to pay attention to any conversation Henry initiated regarding a bank robbery. *Id.* at 268, 100 S.Ct. at 2185–2186 (Opinion of the Court). The informant was to be paid for any information he produced. He had several conversations with Henry, during which Henry made incriminating statements that were subsequently introduced at trial. The Court held that under those facts, "a Government agent 'deliberately elicited' incriminating statements from Henry within the meaning of *Massiah.*" *Id.* at 270, 274, 100 S.Ct. at 2186, 2188–2189. Foremost among the three factors the Court considered important in reaching that result was that the informant "was acting under instructions as a paid informant for the Government." *Id.* at 270, 100 S.Ct. at 2187. In contrast, Cooper was neither paid nor instructed. She had been contacted by the FBI and had consented to have her phone tapped, but from the record before us it appears that, unlike the informant in *Henry,* she was a "passive listener." *Id.* at 271, 100 S.Ct. at 2187. Franklin points out that she asked him about the events in Salt Lake City. However, she directly questioned him only in subsequent conversations; her later questions do not affect Franklin's statement volunteered in the initial conversation.

### B. Fifth Amendment

Franklin argues that his statement should not be admitted because he was not given the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* applies only to "custodial police interrogation." *Id.* at 439, 86 S.Ct. at 1609. Franklin was concededly "in custody" at the time because he was at a police station, guarded by officers, and under arrest. The issue then is whether his conversation with Cooper amounted to "police interrogation."

The Supreme Court has recently expounded the meaning of "interrogation" under *Miranda. See Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Although "interrogation" includes more than just express questioning, it extends "only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 302, 100 S.Ct. at 1690 (emphasis deleted).

■ Drawing on his Sixth Amendment arguments that Cooper was a government agent and deliberately elicited incriminating remarks from him, Franklin urges that Cooper's acceptance of his telephone call was the equivalent of police interrogation. Such a reading would strain the meaning of *Miranda* and its progeny. Franklin's call to Cooper was simply not the "sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (holding *Miranda* inapplicable because defendant not "in custody"); *see also Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (not "in custody"). "[A] necessary element of compulsory self-incrimination is some kind of compulsion." *Hoffa v. United States,* 385 U.S. 293, 304, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966). The record shows that Franklin was not compelled to make his statement to Cooper.

### IV.

### ROBERT HERRERA'S TESTIMONY

Franklin contends that the district court abused its discretion in permitting Robert Herrera to testify. Although he concedes that the Government violated no federal rule or case law in its failure to apprise defense counsel of Herrera's statement as soon as possible, he asserts that exclusion of Herrera's testimony is the only appropriate sanction for the Government's violation of its open-file policy.

Herrera, who was then an inmate of the Salt Lake County jail, contacted the FBI on

February 17, 1981, six days before Franklin's trial began on February 23. Herrera told an agent that he was in the same cellblock as Franklin and that Franklin had admitted shooting the two joggers in Liberty Park. The FBI agent passed on this information to the United States Attorney's office the next day, February 18. In order to determine Herrera's value as a witness, the Government attorneys arranged to interview him the following day. During the interview, Herrera revealed further information, including escape plans of Franklin. Herrera also told the attorneys that Franklin himself had suggested that he go to the FBI with the story and then later recant it on the witness stand. The Government decided not to follow its open-file policy with respect to Herrera. Herrera's name was pencilled in with a question mark beside it on the witness list the Government provided the defense on Friday, February 20. The Government attorneys did not make their final decision to use Herrera as a witness until Monday, February 23, the first day of trial, when they learned the results of a polygraph test he had been given on Friday. Herrera's name was then included on the Government's formal witness list.

On the morning of the fourth day of trial, the Government gave defense counsel a copy of the FBI report dated the 18th, summarizing Herrera's first statement. Defense counsel moved immediately for (1) exclusion of Herrera's testimony; (2) a mistrial (an option Franklin opposed); or (3) a continuance to enable the defense to investigate Herrera. The trial court instead asked the Government to delay calling Herrera as a witness until Monday. The judge reasoned that the delay would give the defense Thursday afternoon, Friday, and the weekend to do any needed investigation and preparation.

We observe initially that "the sanctions to be imposed, if any, because of a failure to comply with a pretrial discovery order rest within the sound discretion of the trial court." *United States v. Baxter (Hernandez Cases)*, 492 F.2d 150, 174 (9th Cir.) (pretrial order), *cert. dismissed*, 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38 (1973), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). *See also United States v. Herring*, 582 F.2d 535, 541 (10th Cir.1978) (open file agreement); *United States v. Weatherspoon*, 581 F.2d 595, 598–99 (7th Cir.1978) (witness list agreement); *Hansen v. United States*, 393 F.2d 763, 769 (8th Cir.) (pre-trial order), *cert. denied*, 393 U.S. 833, 89 S.Ct. 103, 21 L.Ed.2d 103 (1968).

Admission of testimony despite violation of discovery agreements has been upheld in similar circumstances. For example, in *United States v. Smith*, 496 F.2d 185 (10th Cir.1974), *cert. denied*, 419 U.S. 964, 95 S.Ct. 225, 42 L.Ed.2d 179 (1974), this court upheld the trial court's admission of certain checks into evidence although copies had not been given to the defense until the first day of trial in violation of the pretrial order. The admission was not an abuse of discretion because "[t]he government showed the trial court that the relevance of the evidence had not become significant until the Friday preceding the Monday when the trial commenced." *Id.* at 190. *See also Weatherspoon*, 581 F.2d at 599 ("Inasmuch as the Government turned over its witness list as soon as [its] witnesses had been selected, the Government cannot be charged with bad faith or intentional noncompliance with its informal discovery agreement.").

In *United States v. Baxter*, 492 F.2d 150, the Government supplied defense counsel with a witness' grand jury testimony three days after the trial began in violation of a discovery order directing provision of such information at least twenty-four hours before trial. The Ninth Circuit held that the district court did not err in allowing the witness to testify four days later in the trial because that gave the defense sufficient preparation time to meet his testimony. *Id.* at 173–74.

■ Here the defense had Herrera's name on the witness list as soon as the Government decided to use his testimony. Inquiry could have begun then. Delaying his testimony until Monday gave the defense three and a half days to prepare.

Defense investigators did interview Herrera over the weekend, and the defense did not repeat its request for a continuance on Monday. Under these circumstances, the trial court did not abuse its discretion in allowing Herrera to testify.

## V.

### NEW TRIAL

■ Franklin protests the district court's denial of his motion for a new trial on the ground of newly discovered evidence. Franklin argued below that a new trial was warranted because on the last day of trial the defense located an inmate who would testify "that Herrera had stated that he intended to 'set Franklin up' in order to acquire an early release from jail by claiming that Franklin had confessed to him." Rec., vol. I, at 170.

We set out the standard for assessing a motion for new trial based on newly discovered evidence in *United States v. Maestas*, 523 F.2d 316 (10th Cir.1975).

"Before a new trial for newly discovered evidence should be granted, the defendant has the burden to show *that the evidence was discovered since trial;* facts from which the Court may infer reasonable diligence on the part of the movant; and that the evidence is not merely cumulative or impeaching but is material and of such a character that on a new trial such evidence would probably produce a different result."

*Id.* at 320 (emphasis in original). *See also United States v. Allen*, 554 F.2d 398, 403 (10th Cir.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977). The trial court correctly applied this test in denying Franklin's motion. First, it determined that "the evidence discovered was found during the course of trial and verified as the trial was about to conclude. If counsel desired, he could have moved the Court to reopen the defense for one more witness prior to presenting closing arguments." Rec., vol. I, at 184. Second, the court suggested that counsel could have gained from Franklin "basic information as to who

Herrera was." *Id.* Third, the court found that

"[t]he evidence which is alleged as newly discovered does not deal with issues of whether Franklin did or did not shoot the joggers near Liberty Park, but at best might be viewed as impeaching Herrera's credibility .... [Franklin] has not demonstrated that even if such evidence had been available for trial, and used, that a different result would have been probable."

*Id.* at 184–85. These findings are supported by the record. We find no abuse of discretion.

## VI.

### SUFFICIENCY OF THE EVIDENCE

■ Franklin argues that the evidence was insufficient to support the verdict. In particular, Franklin suggests the Government failed to establish that Fields and Martin were killed because they were or had been enjoying a public facility. We disagree. Several witnesses testified that Franklin had disapproved of the racial mixing at Liberty Park. Hawley and Herrera both testified that he told them he shot two black joggers "to do something about it." Rec., vol. VII, at 832. The jury could well have inferred that he intended to deprive the victims of the opportunity to enjoy public facilities. *See United States v. Johns*, 615 F.2d 672 (5th Cir.1980), *cert. denied*, 449 U.S. 829, 101 S.Ct. 95, 66 L.Ed.2d 33 (1980); *United States v. Griffin*, 525 F.2d 710 (1st Cir.1975), *cert. denied*, 424 U.S. 945, 96 S.Ct. 1414, 47 L.Ed.2d 351 (1976). The record reflects that the Government presented sufficient evidence, as discussed above, from which the jury could find Franklin guilty.

AFFIRMED.