UNITED STATES of America, Plaintiff,

v.

Michael SAARI, Defendant.

No. 99–20077 G.

United States District Court, W.D. Tennessee, Western Division.

Dec. 14, 1999.

Tracy Lynn Berry, Assistant U.S. Attorney, Memphis, TN, for plaintiff.

Thomas J. Gibson, Assistant Fed. Defender, Memphis, TN, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

GIBBONS, District Judge.

Before the court is defendant Michael Saari's motion to suppress evidence. Saari argues that all evidence, including statements, resulting from the unconstitutional search and seizure of his person and his residence, should be suppressed. The court referred this motion to United States Magistrate Judge Diane Vescovo pursuant to 28 U.S.C. § 636(b)(1)(B). Judge Vescovo held a hearing on October 25, 1999, regarding Saari's motion to suppress. On November 1, 1999, the magistrate judge filed a report and recommendation.

Judge Vescovo recommended granting Saari's motion to suppress all the evidence seized during a search of his person and of his apartment, including specifically all of the firearms, ammunition, and any statements made by Saari. The United States filed objections to the magistrate judge's report and recommendation. Saari filed a response to the United States' objections. In the United States' objections, it argued that the issue of defendant's arrest was not clearly presented in defendant's motion to suppress, and therefore requested permission to present further evidence on that issue. On December 10, 1999, the court held an additional hearing to allow the United States an opportunity to present evidence on the issue of defendant's arrest.[1]

The court adopts the magistrate judge's report and recommendation in this order with respect to the proposed findings of fact with several exceptions that are set forth later in this order. The court also makes additional findings of fact based on the evidentiary hearing held in this court on December 10, 1999. In addition, the court incorporates the magistrate judge's report and recommendation in this order with respect to Section II. Consent to Enter the Apartment, Plain View and Protective Sweep, and Section III. The Validity of the Search Warrant. With respect to Section I. The Arrest of the Defendant, the court finds that the magistrate judge's report was correct in its conclusions, but now deems it appropriate to set forth more explicitly the basis for this court's finding on the issue of defendant's arrest.

In the proposed finding of facts, the magistrate judge found that there was no indication that anyone had spoken to Anne Saari, defendant's ex-wife. Before this court, Officers Galeocredo Bateman and Robert C. Bridges both testified that they spoke to Ms. Saari, and questioned her about the defendant before proceeding to defendant's apartment.[2] The magistrate

---

1. Officers Galeocredo Bateman and Robert C. Bridges both testified at the hearing on December 10, 1999. The court also heard additional testimony from Officer Wilton Cleveland.

2. Based on the testimony before the magistrate judge, her finding that there was no indication that any of the officers spoke to Ms. Saari is understandable. In the evidentiary hearing before the magistrate judge, Cleveland testified that he and his partner, Bateman, responded to an assistance call for officers who were handling a follow-up domestic disturbance situation, and that the officers were going to defendant's apartment and needed back-up. (Tr. at 47.) Cleveland did not testify that he had spoken to Ms. Saari before proceeding to defendant's apartment. Cleveland, however, did testify that he and his partner did not respond to the original dispatch to Ms. Saari's home, but were responding to a dispatch call to aid Currin. (Tr. at 56–57). Cleveland stated that he had information from dispatch that Mr. Saari may be armed. He never indicated that he had spoken to Ms. Saari and, instead, indicated that his information was based on a call from dispatch and talking to other officers. Cleveland stated, "I don't recall the difference between what the dispatcher had said and what the officers said when we met them on the scene. I believe they had more detailed information about it."

judge also found that Officers Currin and Bridges bypassed Ms. Saari's house. In the district court, Bridges testified that he and Currin were in separate cars and that he went to Ms. Saari's house and interviewed her about the disturbance and obtained enough information to fill out a report. Ms. Saari advised Bridges that defendant was armed at all times and had a history of being armed. Bridges then proceeded to defendant's apartment. The court finds credible the testimony of Bridges and Bateman concerning the contacts with Ms. Saari.

With respect to the findings regarding the police officers' initial contact with defendant and subsequent events, the court finds the facts as follows. Upon arriving at defendant's apartment, the four officers decided to approach the house and make contact with defendant. Cleveland testified that the front door was closed and the shades were drawn, but he saw some movement inside the apartment through the drawn shades. Defendant's apartment was on the second floor. Cleveland and Currin positioned themselves on a landing approximately in front of defendant's front door. Bridges stood about four steps down from the landing and Bateman was positioned at the bottom of the steps.[3] Cleveland had a 12–gauge, pump-action shotgun drawn and in a "low ready" position, that is, pointed at approximately forty-five degrees toward the ground in front of the door. Currin had his service weapon drawn. Bridges testified that he drew his service weapon after officers Cleveland and Currin made contact with defendant and then immediately went to the top of the stairs. Bateman testified that she waited on the first floor with her gun drawn until she heard that defendant had been disarmed at which time she went to the second floor.

Cleveland and Currin knocked forcefully on defendant's apartment door and identified themselves as police as defendant answered the door. The officers were approximately four feet away from defendant. Cleveland testified that he thinks that defendant's door was still closed when the officers announced "police." Neither Currin nor Cleveland was able to recall whether defendant was ordered out or whether he came out. However, Cleveland testified that the officers would not have permitted defendant to stay inside his apartment. (Tr. at 65.) Defendant, on the other hand, specifically testified that when he opened the door, he was standing inside his apartment in the doorway. According to defendant, the officers had their weapons pointed at him and instructed him to step outside. The court finds defendant's uncontroverted testimony that he was ordered to come out of the apartment to be credible and finds as a fact that such order was given. Defendant testified that he stepped outside because he was ordered to do so and he was afraid of being shot. He stepped out with his hands above his head. While the guns were still trained on the defendant, one of the officers asked him if he had any weapons. Defendant informed the officers that he had a gun in the waistband of his pants. The officers then removed a handgun from defendant's waistband and placed him in handcuffs. Because it was dark, neither officer was able to see the weapon before they asked defendant to step outside and asked him if he had a weapon.

Because the court adopts the remainder of the magistrate judge's proposed facts, the court now turns to the conclusions of law. Defendant contends that his warrantless arrest violated the Fourth

Currin testified that his information regarding defendant "came from the victim" and that he had not spoken to Ms. Saari before he went to defendant's apartment. (Tr. at 19). Currin testified that he called for backup and waited for only a "few minutes" before they arrived. (Tr. at 26.)

**3.** Bateman and Bridges testified as to their positions on the landings as stated above. Their testimony differed from that of Currin who had testified that both officers were stationed by a side window. (Tr. at 27.)

Amendment of the United States Constitution under *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The United States argues that the doorway of a home is considered a public place, and, therefore, defendant was not entitled to the heightened level of Fourth Amendment protection described in *Payton.* The United States relies on the fact that the officers did not use subterfuge or coercive actions to force the defendant to open the door.

The United States asserts that because defendant opened the door and exposed himself to the public, the determination of whether a Fourth Amendment violation occurred is governed by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny.[4] The United States argues that the facts available to the officers provided reasonable suspicion to support a brief investigatory stop of defendant.[5] *See id.* The government then argues that after defendant appeared at the door and the officers determined that he had a weapon, they were justified in arresting him and seizing the weapon. The court finds that the officers' conduct from the time the defendant answered his door cannot be characterized as a brief investigatory stop. Reasonable suspicion would have supported a brief investigation of defendant if he had been encountered outside the apartment. *See United States v. El–Gabrowny,* 876 F.Supp. 495, 498–99 (S.D.N.Y.1994). However, in this case, "the use of force to compel the investigatory stop did not occur on the street but was directed at a private residence—a place

entitled to special consideration under the Fourth Amendment." *See United States v. Gori,* No. 98 CR. 1163, 1999 WL 322651, at * 8 (S.D.N.Y. May 20, 1999) (quoting *United States v. Gomez,* 633 F.2d 999, 1006 (2d Cir.1980)).

■ The record indicates that "as a practical matter" defendant was under arrest from the inception of his encounter with the officers. *See United States v. Morgan,* 743 F.2d 1158, 1163 (6th Cir.1984) (citing *Florida v. Royer,* 460 U.S. 491, 503, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Generally speaking, "an arrest requires either physical force … or, where that is absent, submission to the assertion of authority…. An assertion of authority and purpose to arrest followed by submission of the arrestee constitutes an arrest." *California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (citation omitted). This standard is an extension of the traditional view that an arrest occurs only if "a reasonable person would have believed he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

■ In the instant case, the police officers' show of force and authority was such that a reasonable person would not have believed he was free to leave. The officers positioned themselves in front of the only exit from defendant's apartment. The officers knocked forcefully on the door announcing their presence. Defendant opened the door, and the officers confronted him from approximately four feet away with guns drawn and pointed at or near

---

**4.** According to Judge Vescovo's report and recommendation, the United states did not pursue a "probable cause to approach" or even "Terry stop" argument at the hearing, but instead relied on its position that no arrest occurred. (Judge Vescovo's Report and Recommendation at 6 fn. 3.) Judge Vescovo noted that even if the United States had pursued those arguments, "the court finds this encounter amounted to more than a brief investigatory detention because of the show of force." *Id.*

**5.** The United States argued that the officers' conduct in fact constituted a brief investigatory stop valid under *Terry.* However, the United States offered no legal support for this theory in light of the show of force and authority by the officers. *See United States v. Gori,* 1999 WL 816172, at *2 (S.D.N.Y. Oct.13, 1999) ("Even if one were to agree that defendants here voluntarily exposed themselves to public view … there is no legal support to allow a Terry investigation to be conducted by the exercise of police authority supported by drawn guns to order people out of their home.").

him. The officers then instructed defendant to step outside his apartment. Defendant stepped out with his hands raised over his head. Under these circumstances no reasonable person would have believed that he was free to remain inside his apartment. The actions of the officers constituted a show of physical force resulting in defendant's acquiescence to their assertion of authority. Therefore, defendant was placed under arrest when the officers blocked the only exit from his apartment, with guns pointed at the front door, and instructed him to step outside.[6]

■ The government, however, argues that even if defendant was arrested, no warrant was necessary because he was arrested outside of his apartment and with probable cause. It is undisputed that the police officers did not possess an arrest warrant when they approached defendant's apartment. In *Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court held that the Fourth Amendment "prohibits the police from making a warrantless and non-consensual entry into a suspect's home in order to make a routine felony arrest" even when the police have probable cause to make the arrest. *Id.* at 576, 100 S.Ct. 1371. "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590, 100 S.Ct. 1371.

■ Defendant's case involves a threshold arrest. Threshold arrests are arrests made or attempted without a warrant when the suspect is either at or slightly within or behind the threshold of the home, but not in front of the threshold or outside the home. The Supreme Court has not directly addressed the issue of threshold arrests in situations where the police knock on the suspect's door. In

*Payton*, the Supreme Court addressed two cases where the police entered a suspect's home with probable cause to arrest the suspect but without a warrant. 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In one of the cases, the suspect's son answered the door after police knocked. The officers saw the suspect sitting in bed and entered and arrested him. The Court held the arrest violated the Fourth Amendment. *Id.* at 576, 100 S.Ct. 1371. Applying *Payton* to the facts of his arrest, defendant contends that the officers unconstitutionally forced him from his home and arrested him when they pointed their weapons at him while blocking the only exit from the home and instructed him to step outside.

The United States responds that defendant's arrest was constitutional under *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). In *Santana*, police saw defendant Santana standing in her doorway directly after the crime had been committed. The police officers had probable cause to arrest Santana but no arrest warrant. As the officers approached her house, they shouted "police," at which point Santana ran into her house. The police followed her inside and arrested her. The Supreme Court found that Santana had no expectation of privacy while standing in her doorway. *Id.* Therefore, the Court held the arrest was proper because Santana was in a public place when the police initiated the process of arrest. The Court noted that Santana's presence at the threshold of her house was "public" because "[s]he was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.* at 42, 96 S.Ct. 2406. The Court explained that completion of the arrest by entry into Santana's home was justified by exigent circumstances, specifically "hot pursuit," and concluded "that a suspect may not defeat an arrest which has been set in motion in a

---

6. See also Judge Vescovo's Report and Recommendation at 9–13, in which she discusses cases in three circuits where the courts have found that an arrest occurs in situations similar to the instant case.

public place ... by the expedient of escaping to a private place." *Id.* at 43, 96 S.Ct. 2406.

The United States argues that because defendant was standing in the doorway of his apartment, he was in a "public" place when the police initiated the arrest. Judge Vescovo's report and recommendation discusses three cases, factually similar to the instant case, in which courts have found that an arrest occurs inside the house giving rise to a *Payton* violation where there is a sufficient show of force by police to coerce a suspect to leave his home and to surrender to police custody. (Judge Vescovo's Report and Recommendation at 9–13) (discussing the Sixth Circuit's opinion in *United States v. Morgan,* 743 F.2d 1158 (6th Cir.1984), the Third Circuit case of *Sharrar v. Felsing,* 128 F.3d 810 (3d. Cir.1997), and the Tenth Circuit's opinion in *United States v. Maez,* 872 F.2d 1444 (10th Cir.1989)). These cases all provide persuasive authority for the proposition that the officer's arrest of defendant was in violation of *Payton.* The United States argues that all of these cases involve subterfuge or coercion in getting defendant out of his home and are therefore distinguishable because in the instant case the defendant voluntarily exposed himself to arrest.

The court finds that the decisions of the Supreme Court and this Circuit do not support the existence of a voluntary exposure exception to *Payton.*[7] The Supreme Court reiterated its *Payton* holding in *New York v. Harris,* 495 U.S. 14, 17, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). In *Harris,* police officers with guns drawn knocked on the door of Harris' apartment. Harris looked out of the peephole of the door, and one of the officers displayed his badge. Harris opened the door and permitted the officers to enter, at which time the officers arrested Harris. *Id.* at 15–16, 110 S.Ct. 1640. The Supreme Court stated: "For present purposes, we accept the finding below that Harris did not consent to the police officers' entry into his home and the conclusion that the police had probable cause to arrest him. It is also, evident, in light of *Payton,* that arresting Harris in his home without an arrest warrant violated the Fourth Amendment." *Id.* at 16–17, 110 S.Ct. 1640. The *Harris* Court explained that *Payton* drew a line at the entrance to the home which the police could not cross without a warrant, absent exigent circumstances. *Id.*

In light of *Payton* and *Harris* and because the case is factually distinguishable, the United State's reliance on *Santana* is misplaced.[8] The *Santana* opinion was is-

---

7. In addition, there are strong policy reasons for declining to recognize a voluntary exposure exception. The dissent in *United States v. Vaneaton,* 49 F.3d 1423 (9th Cir.1995), noted:

> "The majority's opinion is also bad policy. It will have the effect of discouraging private citizens from answering knocks at the door by uniformed police officers, by subjecting citizens to warrantless arrests inside their own homes, stemming from nothing more than the common courtesy in answering a police officer's knock on the door. Indeed, it provides a justification for refusing to answer a police officer's knock." *Id.* at 1430.

8. The United States cites only two other cases for its assertion that defendant is not entitled to Fourth Amendment protection because he knowingly exposed himself to the public by answering his door and standing in the doorway. Both of the cases the United States relies on are from the Ninth Circuit. The case of *United States v. Botero,* 589 F.2d 430 (9th Cir.1978), was decided prior to *Payton.* The United States cites *United States v. Johnson,* 626 F.2d 753 (9th Cir.1980), for the proposition that "defendant's presence in his doorway in response to the officer's knock did not give rise to a Fourth Amendment claim because the officers did not use subterfuge to expose the defendant to their physical control." The United States' reliance on *Johnson* is misplaced. In *Johnson,* the Ninth Circuit found a Fourth Amendment violation where defendant opened his door in response to false identification by FBI officers and was arrested. *Id.* at 757. The court noted that the arrest in *Botero* was found valid, and the court distinguished the case on the basis of lack of subterfuge *and* the existence of exigent circumstances. In the instance case, there were no exigent circumstances supporting the warrantless arrest of defendant in his doorway.

sued prior to the Court's decisions in *Payton* and *Harris*. In *Santana*, the Court did not hold that the threshold was a public place under the Fourth Amendment in all cases. Rather, the Court found that Santana was standing in a public place because she was "exposed to public view, speech, hearing, and touch" when the police arrived at her home. The instant case is distinguishable from *Santana*. Defendant's door was closed when the officers approached, causing the officers to knock with guns drawn and instruct defendant to exit his apartment.[9] Defendant's arrest was not set in motion in a public place but in his apartment, a private and protected place, so there was no "hot pursuit." In addition, no other exigent circumstances existed.

As discussed in the magistrate judge's report and recommendation, the Sixth Circuit, in *Morgan*, held that officers violated *Payton* when the officers surrounded defendant's home and ordered him to come out over a loudspeaker. 743 F.2d at 1166. Even though the facts of *Morgan* involved coercion by the officers in getting the defendant to come to the door, the *Morgan* court also referenced the case of *United States v. Herring*, 582 F.2d 535 (10th Cir. 1978). In *Herring*, the police knocked on the door of defendant Chapman's hotel room. Chapman answered the door and was placed under arrest. The police did not have a warrant, but the court found the arrest valid because the officers had probable cause and the arrest occurred in a public place, the entrance of his hotel room. *Id.* at 543 (citing *Santana*, 427 U.S. at 42, 96 S.Ct. 2406.) The *Morgan* court, in discussing *Herring*, stated:

"Herring involved the peaceful arrest of a suspect outside of his motel as he responded to the knocks of the arresting

officers .... to the extent that the Herring court validates the warrantless arrest of an individual standing in the doorway of a private residence absent exigent circumstances, we believe the rule of *Payton v. New York*, would compel a contrary result had Herring been decided subsequent to the *Payton* decision."

The Sixth Circuit opinion in *United States v. Bradley*, 922 F.2d 1290 (6th Cir. 1991), *overruled on other grounds* by *United States v. McGlocklin*, 8 F.3d 1037 (6th Cir.1993), also argues against the application of a voluntary exposure exception. In *Bradley* the court found that the defendant's arrest violated *Payton* where police came to the defendant's door with an indictment and immediately arrested the defendant at threshold when he answered the door. *Id.* at 1295–96. Several other courts have held that law enforcement officers may not circumvent the arrest warrant requirement by simply summoning a suspect to the doorway of the suspect's home in order to effect an arrest in a "public place." *United States v. Berkowitz*, 927 F.2d 1376, 1388 (7th Cir.1991) ("*Payton* did not draw the line one or two feet into the home; it drew the line at the home's entrance."); *United States v. McCraw*, 920 F.2d 224 (4th Cir.1990) ("a person does not surrender his expectation of privacy nor consent to the officers' entry" by partially opening door to determine the identity of those knocking); *United States v. Reed*, 572 F.2d 412, 422–23 (2d Cir.1978) (holding that an arrest just inside door, rather than on threshold, violates Fourth Amendment); *United States v. Herrold*, 772 F.Supp. 1483, 1489–90 (M.D.Pa.1991) (holding that defendant's arrest violated the Fourth Amendment where the defendant was arrested without

---

**9.** In *United States v. Berkowitz*, 927 F.2d 1376, 1387–88 (7th Cir.1991), the Seventh Circuit stated:

> *Santana* does not require a different result. As far as reasonable privacy expectations go, there is a significant difference between a person who for no reason voluntarily decides to stand in his open doorway,

and a person who merely answers a knock on his door. The person who answers the knock and stays within the house is not voluntarily exposing himself "to public view, speech, hearing, and touch as if [he is] standing completely outside [his] house." *Santana*, 427 U.S. at 42, 96 S.Ct. 2406.

a warrant when he came to the door in response to a Trooper's knock and there were no exigent circumstances). *But see United States v. Vaneaton,* 49 F.3d 1423, 1427 (9th Cir.1995) (holding that police did not violate the Fourth Amendment when they made a warrantless arrest of a suspect who answered the door in response to a knock and focusing on whether the defendant voluntarily exposed himself to the warrantless arrest by freely opening the door). Therefore, the court finds that defendant's arrest occurred inside his apartment when the officers knocked on defendant's door and instructed him to step out at gunpoint.

Because the officers did not have a warrant and the arrest occurred in defendant's apartment, the arrest could be lawful only if there were exigent circumstances. *See Welsh v. Wisconsin,* 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). The court adopts the magistrate judge's report and recommendation finding that there were no exigent circumstances sufficient to justify the failure of the police to obtain a warrant. (Magistrate Judge Vescovo's Report and Recommendation at 13–15.) Therefore, the court finds that defendant's arrest violated the Fourth Amendment.[10] Accordingly, the court GRANTS Saari's motion to suppress.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

VESCOVO, United States Magistrate Judge.

Defendant Michael Saari was indicted on thirteen counts of being in possession of a firearm after a protective order was entered against him, in violation of 18 U.S.C. § 922(g)(8). He is charged with possessing a handgun, eleven other firearms, and approximately 6,540 live rounds of ammunition. Saari seeks to suppress all evidence seized during a search of his person and of his apartment, including specifically all of the firearms, ammunition, and any statements that he made. As grounds, he asserts that he was illegally seized in violation of the Fourth Amendment, that all the evidence subsequently seized was tainted as a "fruit of the poisonous tree," and that the search of his apartment was unconstitutional because the police did not have a warrant, consent, or exigent circumstances. His motion is presently before the court upon referral by United States District Court Chief Judge Julia Gibbons for an evidentiary hearing and report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

An evidentiary hearing was held on October 25, 1999. During the hearing, the government called two witnesses, Officer James Currin and Officer Wilton Cleveland, both of the Memphis Police Department. The defense called Mr. Saari and Jonathan D. Wilson, the next-door neighbor of Saari's ex-wife, Anne Saari. For the reasons that follow, defendant's motion should be granted.

## PROPOSED FINDINGS OF FACT

On March 14, 1999, members of the Memphis Police Department received a call regarding "shots fired" at the residence of Anne Saari, the defendant's ex-

---

**10.** Defendant's motion to suppress moves the court to suppress all evidence, including statements, resulting from the unconstitutional search and seizure of his person. Defendant did not specify the statements of which he requests suppression. The court notes that suppression of defendant's statement that he was armed at the time of his arrest is proper. However, to the extent that defendant made any incriminating statements while he was in custody, such statements may be admissible under the Supreme Court's decision in *Harris.* In *Harris,* the Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his house, even though the statement is taken after an arrest made in violation of *Payton.*" 495 U.S. at 21, 110 S.Ct. 1640. Because defendant has not identified or specifically requested the suppression of such statements and there is no record of any such statements, the court need not determine if the officers had probable cause to arrest, thereby allowing the statements to be admitted.

wife. The dispatcher informed Officer James Currin and his partner, Officer Bridges, of the call and gave a description of the suspect, the suspect's vehicle, and the direction that the suspect had traveled upon leaving Ms. Saari's residence. The dispatcher also confirmed no one was shot or injured. Bypassing Ms. Saari's home, the two officers drove directly to the defendant's apartment. Finding defendant's car there, the two officers called for back-up. Officer Wilton Cleveland and his partner, Officer Bateman, responded to the request for assistance several minutes later. There was no indication from either of the officers who testified that anyone had spoken with Ms. Saari or had been to her residence before they went to the defendant's apartment or had taken any steps to confirm the information. Indeed, there was no indication that Ms. Saari was even at home that evening.[1] Officer Currin testified that he received general information at some point that defendant possessed explosive devices in his home. Officer Cleveland testified that he was advised that the defendant belonged to the militia and was heavily armed. The source of this information was not identified, and no further details concerning the types or quantities of explosives or arms were provided.

Upon arriving at the defendant's apartment, the four officers decided to approach the house and "make contact" with the defendant. Officer Cleveland testified that the front door was closed and the shades were drawn, but he saw some movement inside the apartment through the drawn shades. Officers Cleveland and Currin positioned themselves on a landing in front of defendant's front door; Officers Bateman and Bridges stood to the side near an exterior window. Other than these portals, there were no other entrances to the apartment. Officers Bridges and Currin had their service guns drawn and pointed at the front door; Officers Bateman and Cleveland each had twelve-gauge pump-action shotguns drawn. Officer Cleveland testified that his shotgun was not pointed directly at the door, but was rather in a "low-ready" position, that is, pointed at approximately forty-five degrees toward the ground in front of the door.

One of the officers knocked on the door, and defendant opened it and stood in the doorway. He then stepped out on the landing with his hands raised over his head. Neither of the officers who testified could recall whether they ordered defendant to come out of the apartment or whether he came out voluntarily. Defendant, on the other hand, specifically testified that when he opened the door, the officers immediately instructed him to step outside. The court finds defendant's uncontroverted testimony that he was ordered to come out of the apartment to be credible and finds as fact that such an order was given. Defendant testified that he did not feel free to ignore the officers or to leave because he was afraid that he would be shot if he did. In fact, Officer Cleveland candidly admitted that the defendant was not free to leave, nor would he have permitted defendant to ignore his orders.

While the guns were still trained on the defendant, one of the officers asked him whether he had any weapons.[2] Defendant answered affirmatively while pointing to his waist with his hands still raised in the air. The officers then removed a handgun from defendant's waistband and placed him in handcuffs. Because it was dark, neither officer was able to immediately see the handgun before defendant advised

---

1. The court originally assumed that Ms. Saari had placed the telephone call to the police claiming that shots had been fired. However, Wilson testified that it was his fiancee who had called the police at his direction, but that he did not hear what she told the dispatcher.

The government presented no proof on this issue.

2. Officer Currin believed Cleveland asked defendant if he was armed. Officer Cleveland could not recall if he himself asked the question but knew that someone asked it.

them of its location even though the handgun was not concealed.

Both officers testified that one of the officers then "asked" defendant to re-enter the apartment. Defendant stated under oath that he was "instructed" to go back inside. Upon entering the apartment, the officers placed defendant, still handcuffed, on a loveseat or sofa in the living room. In that room, Officer Currin observed several videotapes, a parabolic antenna, and two green metal ammunition boxes. While Officer Currin waited with defendant, the other officers began to search the apartment over defendant's vocal objections. Officer Cleveland discovered rifles in a walk-in closet and in a closed bag in the bedroom, and a pistol and a blow-dart gun in the bedroom, but he did not remove the items.

Two days later, the officers applied for and received a search warrant. The affidavit in support of the search warrant was based solely on knowledge acquired by the officers in the apartment and their personal observations of the guns and other items therein. Pursuant to the search warrant, the officers returned to defendant's apartment and seized a variety of guns, ammunition, and videotapes.

## PROPOSED CONCLUSIONS OF LAW

Defendant insists that his warrantless arrest on the landing outside his front door after being forced to exit his apartment at gunpoint violates the Fourth Amendment and that the subsequent search of his residence and seizure of evidence should be suppressed as tainted under the "fruit of the poisonous tree" doctrine. The government's response is three-fold. First, the government denies that defendant was arrested. In its written response to the motion to suppress, the government insisted that the officers had "probable cause to approach [the] defendant."[3] (*See* Govt's Memo. at ¶ 1.) Second, the government

argues that the defendant consented to the police entering his home. After entry, some items were discovered in defendant's apartment in plain view, and the remaining items were discovered during a "protective sweep" of the defendant's apartment. Third, the government claims that the search warrant issued subsequent to the initial arrest and search purged the taint of any illegality.

### I. The Arrest of the Defendant

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. This amendment exists to ensure the inviolability of an individual's home, because "a man's home is his castle," whether he is "innocent [or] guilty . . . rich [or] poor. . . ." *United States v. Nelson*, 459 F.2d 884, 885 (6th Cir.1972). The Sixth Circuit has recognized that this doctrine dates to the founding of the United States:

> The poorest man may in his cottage bid defiance to all the force of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storms may enter, the rain may enter, but the King of England cannot enter; all his forces dare not cross the threshold of the ruined tenement!

*Id.* at 885 (quoting William Pitt, Earl of Chatham, Speech on the Excise Bill). The issue in the present case is whether police may, consistent with the requirements of the Fourth Amendment, force a man from his home at gunpoint, arrest him without a warrant, search his home and seize his property.

■■ It is a well-settled constitutional principle that the police may arrest a person in a public place, even without a war-

---

**3.** The government did not pursue a "probable cause to approach" or even "Terry stop" argument at the hearing, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), but relied instead on its position that no arrest occurred. Even if it had, the court finds this encounter amounted to more than a brief investigatory detention because of the show of force. *See Morgan*, 743 F.2d at 1164. *See also id.* at 1168 (Wellford, J., concurring).

rant, so long as they have probable cause to believe that the individual has committed a crime. *See United States v. Watson*, 423 U.S. 411, 423–24, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). However, the police are generally prohibited from entering a person's residence to arrest him without a warrant, even with probable cause. *See Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). As the Supreme Court noted, "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* Thus, the first question is whether defendant was "arrested" and if so, where. If the arrest was effectuated while defendant was inside the house and there were no exigent circumstances, then the arrest was unlawful under *Payton*.

Generally speaking, "an arrest requires either physical force . . . or, where that is absent, submission to the assertion of authority. . . . An assertion of authority and purpose to arrest followed by submission of the arrestee constitutes an arrest." *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (quoting Rollin M. Perkins, *The Law of Arrest*, 25 Iowa L.Rev. 201, 206 (1940)). This standard is an extension of the traditional view that an arrest occurs only if "a reasonable person would have believed he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554–55, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

In cases factually similar to the present one, at least three circuits have found that an arrest occurs inside a house giving rise to a *Payton* violation when there is a sufficient show of force by police to coerce a suspect to leave his house and to surrender to police custody. *See Sharrar v. Felsing*, 128 F.3d 810 (3d Cir.1997); *United States v. Maez*, 872 F.2d 1444 (10th Cir.1989); *United States v. Morgan*, 743 F.2d 1158 (6th Cir.1984). First and most importantly, in *Morgan*, the Sixth Circuit held that coercive police behavior outside a residence which forces the occupant to exit the residence so that police may effectuate an arrest constitutes a constructive in-house arrest. In *Morgan*, the sheriff's department received a call about shots fired in a public park in Morgan County, Tennessee. When the officers arrived, they heard weapons fire and then saw several people loading guns into the trunk of a Cadillac. The sheriff asked them to leave the park. While the people were preparing to leave, the sheriff saw one person throw the folding stock of an automatic shoulder weapon into the trunk. The sheriff noted the license plate of the Cadillac but did not immediately search the vehicle because an informant on the scene told him that the occupants of the vehicle had stated they would kill any law enforcement officers who tried to arrest them. The informant also mentioned that the trunk "was filled with machine guns, pistols, and shotguns." *Id.* at 1160. Because the car had departed the scene, the sheriff then broadcast a bulletin for the Cadillac. An officer with a nearby police department received the sheriff's broadcast, observed the car, and followed it to the home of the defendant's mother. Eventually officers came to the home, surrounded it, flooded the home with spotlights and used a bullhorn to ask the defendant to step outside. Defendant came to the front door with a pistol in his hand, but he put it down after police ordered him to do so. He then came outside where he was handcuffed and formally arrested. Another pistol was found on his person. Officers then searched the house and found a dozen loaded guns in the living room.

In upholding the suppression of evidence, the *Morgan* court first determined that there were no exigent circumstances to justify a warrantless in-home arrest. It then examined whether the defendant had been arrested while in his home. The court found that the defendant had come to his front door as a result of "coercive police activity taking place outside of the house." *Id.* at 1166. The court reasoned that although the police never actually entered the house, their behavior constituted

"constructive entry [which] accomplished the same thing...." *Id.* Thus, the warrantless arrest was unlawful under *Payton*, and the evidence seized as a result of that arrest was suppressed.

Similarly, in *United States v. Maez*, 872 F.2d 1444 (10th Cir.1989), the Tenth Circuit found an in-house arrest to have occurred when defendant was arrested outside his trailer after being commanded to exit his trailer. In that case, the law enforcement officers received information that the defendant had committed a bank robbery. The local deputy sheriff had a description of the defendant's vehicle, including a partial license plate number, and knew the defendant. A SWAT team surrounded defendant's trailer while training their rifles on the entrance. Although no officers went to the door, they used a loud speaker to ask the defendant and his family to come outside. The court held that the defendant had been arrested *in his home*, because, under the circumstances, "a reasonable person would have believed he had to come out of the house and submit to the show of authority." *Id.* at 1450.

Finally, in *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir.1997), a § 1983 action, the Third Circuit examined a case in which police forced an estranged husband from his home and arrested him after receiving a report from a woman that she had been severely beaten. When an officer arrived to interview her, the woman told him that "her [estranged] husband ... and three others had come into the house, that they held her while [her ex-husband] pulled a gun and hit her on the side of the head." *Id.* at 814. A SWAT team went to the ex-husband's house, surrounded it with machine guns pointed at the windows, and ordered the ex-husband and his three friends to come out backwards with their hands raised. *Id.* at 819. Under those circumstances, the court held that "there was a clear show of physical force and assertion of authority," that "no reasonable person would have believed that he was free to remain in the house," and that therefore the arrests occurred inside the home. *Id.* at 819. Thus, "the police were required to have secured an arrest warrant unless there were exigent circumstances," *id.* at 820, and the court found that there were no such circumstances.

The present case is analytically and factually similar to each of the above cases. Here, officers arrived at the defendant's apartment without a warrant and then positioned themselves in front of the only exit from the apartment. They drew their guns and pointed them at the front door. They knocked on the door, defendant responded, and they ordered him to step outside. The actions of the officers constituted a show of physical force resulting in defendant's acquiescence to their assertion of authority. Additionally, defendant had his hands over his head and believed that he could neither ignore the commands of the officers nor leave the scene safely. Under the circumstances, this was an objectively reasonable belief. When police arrive on a person's doorstop at night, with guns pointed at the front door, and order him to come outside, he must comply; his "[choice] to exit his home," is not a true choice. *Maez*, 872 F.2d at 1450. Thus, it is submitted that an in-house arrest was effectuated.

Because the police did not have a warrant, the only way that this arrest could be lawful would be if exigent circumstances existed. The government has the burden of proving the existence of exigent circumstances. *See Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (holding that "the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries."). *See also Morgan*, 743 F.2d at 1161. The United States did not specifically argue exigent circumstances in the present case. The court has nevertheless analyzed the traditional list of such circumstances and finds that none are applicable here.

■ Traditional exigent circumstances can be generally grouped into four catego-

ries:[4] (1) evidence is in immediate danger of destruction, see *Schmerber v. California,* 384 U.S. 757, 761–77, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); (2) an immediate threat to the safety of law enforcement officers or the general public exists, see *Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); (3) the police are in hot pursuit of a suspect, see generally *Welsh,* 466 U.S. at 753, 104 S.Ct. 2091 (1984); or (4) the suspect may flee before the officer can obtain a warrant, see *Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

Here, there was absolutely no indication that there was a threat of imminent destruction of evidence. The only evidence that the police strongly suspected the defendant possessed was a handgun, and a handgun is not disposed of as easily as narcotics or other contraband. For example, as noted during argument before the court, a pistol cannot be flushed down a toilet. Nor was the immediate safety of the officers and the general public significantly threatened. The defendant was peacefully residing inside his own apartment when the officers arrived. There was no proof he had anyone hostage or was preparing to take any harmful or violent action. Although the officers had some information that defendant had guns in his house, that alone does not suffice to establish exigent circumstances. If police were permitted to enter homes and arrest people without warrants based solely on a suspicion that weapons were located inside, the Fourth Amendment would be a nullity. The unsubstantiated information about explosives by an unidentified person was too vague and general to constitute an immediate threat to the safety of the officers and the public. The police were not in hot pursuit of a fleeing suspect, either. There was no continuous chase of defendant from the scene of a crime into his house. Rather, the police arrived at his door seeking to arrest him based on unconfirmed information that he had recently fired shots at his ex-wife's apartment. Finally, as long as the exits from his house were guarded, defendant could not flee while officers obtained a warrant. Both officers who testified at the evidentiary hearing indicated that the police present at the scene were stationed so as to cover all of the egresses of the apartment. Thus, none of the traditional exigencies justified the failure of the police to obtain a warrant.

It is submitted therefore that defendant was unreasonably seized in violation of the Fourth Amendment. After being unlawfully seized, defendant was asked if he was armed. Based on defendant's affirmative response, the officers located the handgun tucked in the waistband of defendant's trousers and seized the gun. The government insists that asking a person if he is armed is not a Fourth Amendment violation. While such a question, in and of itself, is not constitutionally impermissible, under the circumstances of this case, defendant's responsive statement was the product of his unlawful arrest and should be suppressed as tainted under the "fruit of the poisonous tree" doctrine enunciated in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (holding that evidence, both verbal and physical, derived from "the exploitation of illegality" is inadmissible without an independent source). The same reasoning applies to the handgun itself.

## II. Consent to Enter the Apartment, Plain View and Protective Sweep

The government urges, however, that even if the initial arrest was invalid, defendant consented to the officers entering his home after he was arrested, and once inside the officers properly conducted a protective sweep and observed items in plain view. In other words, the government, in essence, insists that defendant's consent "purged the taint" of the original unlawful

---

4. For the exigent circumstances situation to apply, probable cause for the search and seizure must exist. It is not entirely clear in the present case that probable cause even existed for the arrest of the defendant.

arrest as to the items seized from inside the apartment. *See Maez*, 872 F.2d at 1454. It is important to note that the government does not claim that the defendant consented to a *search* of the apartment. Indeed, the uncontroverted evidence presented in the hearing was that the defendant vocally protested when officers began their search. Instead, the government merely claims that the defendant consented to the initial entry of the police into his apartment.

■ For consent to be valid the defendant must have authority to consent and must consent freely and voluntarily. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).[5] Whether the consent was freely and voluntarily given "is a question of fact to be determined from all the circumstances," *Bustamonte*, 412 U.S. at 249, 93 S.Ct. 2041, and "must be proven by 'clear and positive' proof." *United States v. Bueno*, 21 F.3d 120, 126 (6th Cir.1994) (quoting *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir.1977)). The fact that the defendant in the present case was the subject of an unconstitutional arrest results in an even heavier burden on the government, because "the mere fact that a person has been arrested in violation of his constitutional rights casts grave doubt upon the voluntariness of a subsequent consent." *United States v. McCaleb*, 552 F.2d at 721 (noting that "the Government has a heavy burden in establishing that the consent was the voluntary act of the arrestee and that it was not the fruit of the illegal arrest.").

■ Assuming, *arguendo*, that the defendant actually gave the police consent to enter the house, it is submitted that the consent was not a product of his own free will. The defendant opened his door after dark and was faced with at least four officers pointing guns in his direction. The officers ordered him out of the house. They then took a gun out of the defendant's waistband and placed him in handcuffs. According to the officers' testimony, defendant was handcuffed before he consented. Moreover, the closest the government came to showing that defendant gave any consent to enter the house was the officers' testimony that defendant "was asked" to go inside and talk to them. No reasonable person would have thought that he had the right to refuse to reenter the house while handcuffed and confronted with armed police.[6] It is submitted, therefore, that any consent was not freely and voluntarily given, and therefore could not purge the taint of the illegal arrest.

■ Nor does the plain view doctrine support the seizure of evidence from the apartment. To invoke the plain view exception to the exclusionary rule in the Sixth Circuit, the government must show two things. First, it must show that the police officer was "lawfully ... in an area from which the object is plainly visible." *United States v. Riascos–Suarez*, 73 F.3d 616, 625 (6th Cir.1996) (citing *United States v. Blakeney*, 942 F.2d 1001, 1028 (6th Cir.1991)); *see also Morgan*, 743 F.2d at 1167. Second, the incriminating character of the evidence must be "immediately apparent." *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *see also Morgan*, 743 F.2d at 1167. In the present case, the police officers were not lawfully present in the apartment when they discovered evidence. The officers were present as the result of

**5.** Both the government and the defendant agreed during oral arguments that the *Bustamonte* test was appropriate for determining whether defendant's consent was valid, despite the fact that the present case involves consent to enter, rather than consent to search.

**6.** This case is distinguishable from *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820,

46 L.Ed.2d 598 (1976), in which the Supreme Court held that a consent to search given after a defendant was arrested on a public street was valid. The Court noted that the arrest in that case was constitutionally permissible and that therefore the consent could not be "the product of an illegal arrest." *Id.* at 424, 96 S.Ct. 820. In the present case, however, the arrest was illegal.

an unconstitutional arrest and an invalid consent to enter, and thus the plain view doctrine is inapplicable. Additionally, it is not clear that any of the evidence in issue would have had an incriminating character that was immediately apparent to the officers. In the living room, officers saw videotapes, a parabolic antenna, and two metal ammunition boxes. Unlike narcotics or drug paraphernalia, these items are not illegal under ordinary circumstances.

Relying on *United States v. Biggs*, 70 F.3d 913 (6th Cir.1995), the United States also argues that the officers were entitled to conduct a "protective sweep" of the apartment following the arrest of the defendant, and that any evidence discovered as a result of that sweep is admissible. In *Biggs*, the Sixth Circuit upheld the warrantless protective sweep search of defendant's motel room incident to his arrest in the parking lot adjacent to the motel as reasonable to ensure the safety of the arresting officers and to allow defendant to retrieve his personal effects from the room. *Id.* at 914.

The Supreme Court established the requirements for a valid protective sweep in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). In *Buie*, the Court held that if police have a reasonable belief based on specific and articulable facts that after an in-home arrest the area still "harbor[s] an individual posing a danger to the officer or others," they may conduct a "quick and limited search of the premises, incident to [the] arrest." This doctrine is merely an extension of the traditional rule that after a lawful arrest, officers may search the area within the "wingspan" of the suspect, under the notion that there is a risk of personal injury to the officers or others if they do not search the area near the suspect for weapons. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

■ The rationale permitting a protective sweep search as set out in *Buie* is not present here for several reasons. First of all, as discussed above, the initial arrest was unlawful, and evidence obtained as a result of a search incident to an unlawful arrest is inadmissible. *See Wong Sun*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. In addition, even if the arrest had been lawful, the officers had no facts whatsoever that would justify a protective sweep. There were no facts articulated to support a belief by the officers that any other individual was in the house. The only reason advanced by the United States as a basis for validating the protective sweep was Officer Cleveland's testimony that anytime he responds to a call he assumes that there are other people in the house or apartment. However, both officers testified that they did not specifically expect to find anyone else in the apartment that evening. Furthermore, the defendant was outside of his apartment, in handcuffs, when the officers decided to go back inside.

*Biggs* is factually distinguishable. The officers in *Biggs* had three separate, articulable facts that yielded a reasonably prudent suspicion of danger: (1) the officers had received information that someone was expected to come to the motel room to meet Biggs; (2) the officers knew that on two prior arrests, someone with a gun had accompanied Biggs; and (3) Biggs left the door of the motel room ajar, thus allowing a clear view of the officers by anyone inside. Moreover, the court determined that it was not unreasonable to accompany Biggs back into the room to retrieve his personal items and clothing from the motel.

In short, it is submitted that both the plain view and protective sweep doctrines are inapplicable.

### III. The Validity of the Search Warrant

The United States finally argues that even if the initial arrest was illegal, the consent was invalid, and neither the plain view nor protective sweep doctrines apply, the search warrant issued two days later purged the taint of illegality. Under some circumstances, this would be true. The Supreme Court has held that evidence dis-

covered during a valid warrant search may be admissible if "none of the information on which the warrant was secured was derived from or related in any way to the initial entry into [defendant]'s apartment." *Segura v. United States*, 468 U.S. 796, 813, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). In that case, officers entered an apartment illegally and secured it while other officers were obtaining a search warrant based on facts unrelated to the illegal entry. Under those circumstances, the Court did not suppress the evidence seized. However, while refusing to suppress the evidence, the Court reaffirmed its previous holdings that any evidence discovered as a *direct result* of an illegal entry would still be suppressed. *Id.* at 812, 104 S.Ct. 3380 (emphasis added). Consequently, a search warrant issued solely on information discovered as a result of the illegal entry would not purge the taint.

In the present case, the search warrant affidavit relies entirely on the information observed during the initial unlawful entry. The affidavit recites that the officers had gone to defendant's apartment on March 14 and "observed numerous ... weapons, ammunition, high capacity magazines, and a listening device." Nothing in the affidavit refers to any independent source of information regarding what the defendant might have had in his apartment. Thus, this case is distinguishable from the facts in *Segura* where officers obtained the search warrant based on information wholly unrelated to the entry. Accordingly, the search warrant did not purge the taint of illegality as it was based entirely on the "fruit of the poisonous tree." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Thus, the evidence in this case should be suppressed pursuant to *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

### RECOMMENDATION

In sum, it is submitted that none of the government's positions are tenable. It is therefore recommended that Saari's motion to suppress be granted.